Nos. 23-1083 and 23-1084

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, APPELLANTS

*v.*

FEDERAL COMMUNICATIONS COMMISSION, APPELLEE

———————————

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, PETITIONERS

———————————

EMERGENCY MOTION TO EXPEDITE
AND CONSOLIDATE

———————————

Kevin F. King
Jennifer A. Johnson
Jocelyn G. Jezierny
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

*Counsel for Appellant/
Petitioner TEGNA Inc.*

Miguel A. Estrada
   *Counsel of Record*
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Appellant/Petitioner
SGCI Holdings III LLC*

*[Additional Counsel Listed On Inside Cover]*

David E. Mills
Michael D. Basile
Henry H. Wendel
Cooley LLP
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C. 20004
(202) 842-7800

*Counsel for Appellant /
Petitioner CMG Media
Corporation*

Stephen J. Hammer
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

Scott R. Flick
Jessica T. Nyman
Pillsbury Winthrop
  Shaw Pittman LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 663-8000

*Counsel for Appellant / Petitioner
SGCI Holdings III LLC*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellants/petitioners certify as follows:

### A.    Parties

**Appellants/Petitioners:**  SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Appellee/Respondent:**  Federal Communications Commission

**Other Parties Before Agency:**  The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.

### B.    Rulings Under Review

The direct appeal (No. 23-1083) seeks review of a final order of the Federal Communications Commission denying appellants/petitioners' applications to transfer station licenses by ordering an unlawful and unnecessary hearing.  Hearing Designation Order, *Consent to Transfer Control of Certain Subsidiaries of TEGNA, Inc. to SGCI Holdings III LLC*, MB Docket No. 22-162, DA 23-149 (Feb. 24, 2023).

The mandamus petition (No. 23-1084) challenges the Commission's unreasonable delay in ruling on appellant/petitioners' applications to transfer broadcast licenses in *TEGNA, Inc.*, MB Docket No. 22-162 (FCC).  Appellants/petitioners seek a writ of mandamus compelling the Commission to rule on those applications by April 28, 2023.

### C.    Related Cases

The appeal in No. 23-1083 and the mandamus petition in No. 23-1084, commenced concurrently, both arise from the same Federal Communications Commission proceeding.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellants disclose the following corporate parents:

SGCI Holdings III LLC is a Delaware limited-liability company that serves as an investment vehicle.[1]  Soohyung Kim is the sole managing member of SGCI Holdings III LLC.  Standard General Master Fund II L.P., a Cayman Islands limited partnership, owns 20.4% of the equity of SGCI Holdings III LLC.  Standard General Master Fund II L.P. is wholly controlled by Standard General L.P., a Delaware limited partnership.  Standard General L.P. is wholly controlled by Standard General Holdings L.P., a Delaware limited-liability company, which is in turn wholly controlled by Standard General S. Corp., a Delaware corporation. Standard General S. Corp. is wholly controlled by Acme Amalgamated Holdings LLC, a Delaware limited-liability company. No corporation owns more than 10% of Acme Amalgamated Holdings LLC.  SGCI Hold-

---

[1] This certificate represents the ownership status of SGCI Holdings III LLC as it currently stands.  It therefore deviates from the ownership structure described in the applications to the Commission, which show the company's post-closing owners.

ings LLC, a Delaware limited-liability company, owns 23.90% of the equity of SGCI Holdings III LLC.  SGCI Holdings LLC, is wholly controlled by Standard General L.P.  EPSG Master SPC Ltd., a Cayman Islands limited corporation, owns 39.1% of the equity of SGCI Holdings III LLC.  EPSG Master SPC Ltd. is wholly controlled by EPSG SPC Ltd., a Cayman Islands limited corporation.  EPSG SPC Ltd. is wholly controlled by Standard General L.P.  No other corporation owns more than 10% of the equity of SGCI Holdings III LLC.

TEGNA Inc. is a publicly traded Delaware corporation that provides media services.  The Vanguard Group owns 10.52% of the stock of TEGNA Inc.  BlackRock, Inc. owns 12.2% of the stock of TEGNA Inc.  No other corporation owns more than 10% of the stock of TEGNA Inc.

CMG Media Corporation is a Delaware corporation that provides media services.  CMG Media Corporation is wholly owned by CMG Media Holdings II, Inc., a Delaware corporation.  CMG Media Holdings II, Inc., in turn, is wholly owned by CMG Holdings, Inc., a Delaware corporation.  AP IX Titan Holdings, L.P., a Delaware limited partnership, owns 71% of CMG Holdings, Inc.  AP IX Titan Holdings, L.P. is owned by funds

managed by affiliates of Apollo Global Management, Inc. (AGM) and ultimately is controlled by AP IX (PMC) VoteCo, LLC (VoteCo), a Delaware limited liability company. AGM's common shares are publicly traded on the New York Stock Exchange (NYSE: APO). Neither VoteCo nor AGM have any parent companies, and no corporation owns more than 10% of either VoteCo or AGM. Cox Enterprises, Inc., a Delaware corporation, owns 19.8% of CMG Holdings, Inc. No publicly traded company owns more than 10% of the stock of Cox Enterprises, Inc. No other corporation owns more than 10% of CMG Holdings, Inc.

Pursuant to 28 U.S.C. § 1657(a), Federal Rule of Appellate Procedure 27, and D.C. Circuit Rule 27, appellants SGCI Holdings III LLC (Standard General), TEGNA Inc., and CMG Media Corporation (collectively, broadcasters) move the Court to expedite these two closely related actions; decide the actions on an accelerated timeline so that the transaction at issue can close by its May 22, 2023, deadline; set an abbreviated briefing schedule; and consolidate the proceedings. Because the broadcasters and the public will suffer irreparable harm without prompt judicial intervention, the broadcasters ask that the Court resolve this motion no later than **April 3, 2023**.

## INTRODUCTION

For reasons known only to itself, the Federal Communications Commission (FCC or Commission) has attempted to block a multibillion-dollar broadcast-television transaction by running out the clock. The transaction would establish the nation's largest ever minority-owned, female-led broadcast television company, while reducing market concentration. Yet the Commission has stood silently by while its Media Bureau, after nearly a year of briefing and discovery, set the matter for an administrative trial on legally irrelevant issues that the Commission

1

knows (and its enforcement staff has conceded) will mean the deal's death.

The broadcasters applied to the Commission in March 2022 for approval of license transfers necessary to effectuate the transaction. Their submissions apprised the Commission that the transaction must be completed by May 22, 2023, when financing necessary for the deal will expire. The Commission had more than 14 months to consider the matter—amply sufficient time. The agency's own policy is to resolve such matters if possible within 180 days, and in practice it has addressed comparable transactions in 62 to 182 days. This transaction presented no complications (required divestitures, regulatory waivers, or the like) to warrant a more protracted process.

But the Commission has deployed delay as a weapon. Its Media Bureau ordered an unprecedented three rounds of public input and acquiesced in demands for extensive discovery by parties challenging the deal. Then, on February 24, 2023—11 months into the process—the Media Bureau abruptly set the matter for a hearing that the Commission well knows will not be completed before the deal's May 22 deadline. The shortest such hearing in the past three decades consumed nearly a year.

That superficially procedural directive (the Hearing Order) is in substance a denial of the broadcasters' license-transfer applications. And by refusing to countermand the Media Bureau's action—despite the broadcasters' urgent requests—the FCC has embraced that de facto denial as its own. The Commission will thus derail the deal without having to justify that denial and back it up with substantial record evidence.

The Commission's action is unlawful for numerous reasons, and the broadcasters have promptly sought this Court's review. In No. 23-1083, they filed a notice of direct appeal under 47 U.S.C. § 402(b)-(c) of the Hearing Order, which is a constructive denial of their applications. In the alternative, if this Court concludes that the Commission has not yet denied the applications, the broadcasters filed in No. 23-1084 a conditional petition for a writ of mandamus directing the FCC to decide the applications by April 28, 2023. If the Commission has withheld final action, that withholding is unlawful, making an extraordinary writ necessary. Whichever procedural path this Court ultimately selects, however, it should expedite the proceedings now to ensure that its consideration of the matter is not mooted by the Commission's procedural gambit. If the Court construes the Commission's action as a denial of the broadcasters'

3

applications (which it is) and holds that denial unlawful on direct appeal, the Court's decision in the appeal must issue in time for the FCC to comply by granting the applications.  If the Court instead holds that the FCC has unlawfully withheld a decision and thereby circumvented judicial review of its determination, a writ of mandamus must similarly issue in time for the Commission to render a decision *and* for judicial review, if necessary, of that decision.

To facilitate this Court's expeditious review, the broadcasters respectfully request that the Court adopt the following schedule to govern briefing in both cases:

- Appellants/petitioners will file their opening brief in the direct appeal (No. 23-1083) by **Thursday, March 30, 2023**.

- Appellee/respondent's response brief in the direct appeal and response to the mandamus petition (No. 23-1084)—consolidated or separate, as the Court may direct—would be due **Tuesday, April 11, 2023**.

- Appellants/petitioners' reply brief(s) in the direct appeal and the mandamus action would be due **Friday, April 14, 2023**.

- If the Court wishes to have argument, argument would be held at the Court's convenience.

The broadcasters additionally request that the Court issue a decision in the direct appeal and on the mandamus petition by April 21, 2023, so

4

that any necessary further proceedings may be completed before the transaction's deadline of May 22, 2023.

In the interests of efficiency, the broadcasters also ask that the Court consolidate their direct appeal and mandamus petition into one proceeding.

Finally, due to the emergency posture of this matter, the broadcasters ask that the Court decide this motion no later than **April 3, 2023**.

Counsel for the broadcasters has contacted counsel for the Commission, counsel for the challengers, and the Clerk's Office and explained why this motion should be handled on an emergency basis.  D.C. Cir. R. 27(f).  The Commission opposes consolidation and opposes expedition as to the direct appeal, but agrees with the briefing and argument schedule proposed above as to the mandamus petition.  The challengers oppose consolidation and take no position on the proposed schedule.

## BACKGROUND

1.    In February 2022, Standard General agreed to acquire TEGNA, a broadcast company, in an $8.6 billion transaction.  Add. 6,

5

141.[2]  After closing, New TEGNA would own 61 full-power television stations and two full-power radio stations.  Add. 141.  The transaction will enhance diversity in broadcasting by tripling the number of minority-owned TV stations in the United States and increasing the number of Asian American-owned Top-4 stations in the 50 largest U.S. markets from zero to 27.  Add. 373, 933.  Moreover, the transaction will reduce concentration in broadcast ownership; New TEGNA will control less national market share than TEGNA does today.  Add. 592.

On March 10, 2022, the broadcasters filed their license-transfer applications with the Commission.  Add. 138; see 47 U.S.C. § 310(d).  The broadcasters' applications contain all applicable merger and purchase agreements, securities term sheets, and 130 pages of exhibits thoroughly describing the transaction, its public-interest benefits, and its compliance with the Communications Act and FCC rules.  Add. 138-311.

The merger agreement filed with the applications also made clear that the final deadline for the transaction to close is May 22, 2023—more than 14 months after the applications were submitted.  Add. 95.  That

---

[2] All record citations in this motion refer to the addendum to the petition filed in *In re SGCI Holdings III LLC*, No. 23-1084.

deadline reflects the expiration of financing commitments critical to the transaction's completion, taking into account all possible extensions (which the broadcasters have since exhausted).  Add. 95; see Add. 973, 1046.  Financing for a future transaction can never be secured in perpetuity or extended indefinitely.  And in the current interest-rate and general economic environment, which differs markedly from when the transaction was first announced, that financing cannot be replicated once it expires.  But by securing those lengthy commitments, the broadcasters ensured that the FCC would have more than ample time to process the applications.  The Commission's stated policy is to adjudicate license-transfer applications in 180 days if possible, and in practice the agency has adjudicated comparable recent applications in as little as one-third of that time.  FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex Mergers*, bit.ly/3FcxUMe (last visited Mar. 27, 2023); Add. 1038. The 14-month window here thus provided the FCC more than double the time it allots for itself.

2.    The Communications Act requires the Commission to grant applications to transfer broadcasting licenses if it finds, following public

notice and an opportunity to comment, that the transfer will serve "the public interest, convenience, and necessity."  47 U.S.C. § 309(a).  A party opposing the transfer may petition to deny it, but unless that petition contains "specific allegations" that are "supported by affidavit of a person or persons with personal knowledge" or suitable for official notice to establish that granting the application would be "prima facie inconsistent" with the public interest, the Commission must reject the petition and grant the application. *Id.* § 309(d)(1)-(2).  The Commission has delegated responsibility for processing routine license-transfer applications to its Media Bureau.  47 C.F.R. § 0.61(a).  So, after the broadcasters filed their applications, the Media Bureau took them up in the first instance.

Instead of exercising that delegated authority consistent with the Commission's own 180-day goal, however, the Media Bureau stretched the process out to more than a year—and counting.  Instead of a single public-comment period, the Bureau invited an unprecedented three rounds of input spread over eight months.  Add. 314, 729, 838.

In addition, the Media Bureau repeatedly departed from ordinary practice to accommodate requests by entities that opposed the applications.  Two sets of entities (collectively, the challengers) filed petitions to

8

deny the applications.  They repeatedly sought extensions of the plead-ing-cycle deadlines, which the Bureau approved.  Add. 348, 663.  And the challengers demanded wide-ranging discovery from the broadcasters, which the Bureau, after waiting months to address the issue, also ap-proved.  The broadcasters promptly provided the requested material. Add. 370-384, 730-753.

3.    After that uncommonly elongated process had concluded, the record amply demonstrated that the statutory "public interest" standard was satisfied.  Members of Congress, state and local legislators, and the gamut of civil society—including civil-rights, labor, broadcasting, media, and business groups—filed more than 50 comments supporting the ap-plications.  Standard General and TEGNA Facts, Supporters, https:// bit.ly/3mI3Lyl (last visited Mar. 27, 2023).

In addition, the challengers had failed to establish any basis for denying the applications or to substantiate any material question of fact that could plausibly necessitate a hearing.  They first argued that the transaction is structured to inflate retransmission fees—the fees that multichannel video-programming distributors (such as Xfinity or Di-recTV) pay stations to retransmit their content.  Add. 407-411, 497-502.

The challengers alleged that, following the merger, Standard General could exploit certain provisions in the contracts between stations and distributors (known as after-acquired clauses) to demand higher overall retransmission fees from distributors, who would in turn pass those increased costs on to consumers. *Ibid.* Second, the challengers argued that Standard General intended to lay off newsroom staff at the stations it was acquiring. Add. 405-407, 496-497. Those hypothesized layoffs, they contended, would diminish the quality of local news coverage. *Ibid.*

The challengers, however, failed to meet their statutory burden to introduce "specific allegations of fact"—"supported by affidavit of a person or persons with personal knowledge" or suitable for official notice—to support either of their theories. 47 U.S.C. § 309(d)(1)-(2). Instead, their arguments rested on bald assertions and unsworn documents, addressed issues irrelevant to the broadcasters' intent in agreeing to the transaction, and expressed speculative concerns. Add. 405-411, 496-502.

But to eliminate any question and assure approval of the applications, Standard General made binding commitments to address both issues. Standard General irrevocably waived its right to enforce any after-acquired clauses that could have increased retransmission fees for the

TEGNA stations it proposes to control following the transaction.  Add. 831.  And, consistent with its intention of increasing rather than reducing station-level staffing, Standard General made a binding commitment not to conduct any newsroom staffing reductions at TEGNA stations for at least two years after the transaction.  Add. 832-833.  Standard General actually plans to increase staffing, as part of its broader investment in increasing news content, but it has limited its undertaking to preserve its ability to respond to changing economic circumstances in the more distant future.  *Ibid.*

4.     Despite the comprehensive and lopsided record demonstrating that the transaction advances the public interest, cemented by Standard General's additional commitments, the Media Bureau declined formally to decide the applications.  Instead, it ordered still more administrative process.  On February 24, 2023—more than 11 months after the applications were filed, and with just 88 days remaining before the transaction's May 22 deadline—the Bureau issued an order designating the applications for an evidentiary hearing before an administrative law judge.  Add. 938-968 (Hearing Order).

11

The Hearing Order directed the ALJ to examine two arguments raised by the challengers: (1) whether the transaction's "structur[e] * * * is likely to trigger a rate increase harmful to consumers, as a result of" after-acquired clauses, and (2) whether the transaction "will reduce or impair localism, including whether [it] will result in labor reductions at local stations." Add. 939.  But the Media Bureau did not identify any "specific    * * *    fact[s]" supported by affidavits based on personal knowledge or subject to official notice, as Section 310(d) requires, that could warrant a hearing.  Instead, the Hearing Order cited only the challengers' own allegations, which in turn relied on magazine articles and the challengers' own characterization of the record and assertions speculating that Standard General's unilateral commitments would be inadequate.  Add. 947-948 (citing Add. 408-410, 498-500, 549-552, 563, 754-755, 861), 952-953 (citing Add. 407, 725-727, 764-768, 770-772).

Although styled as a procedural order prescribing further process, the Hearing Order in reality denied the transfer applications in all but form.  As far as public records over the past 30 years show, no broadcast license transfer or assignment application designated for hearing has ever completed the process in fewer than 358 days; the average hearing

12

takes 799 days.  See p. 24, *infra*.  But this transaction expires on May 22. As not only the broadcasters, but also the challengers, the market, and even the Commission's enforcement staff have uniformly recognized, the Media Bureau's order setting the matter for a hearing likely to span a year or more (if allowed to stand) will necessarily doom the deal.  Add. 1034; Jon Schleuss, *Thank FCC Chair Rosenworcel for Saving Local News*, Newsweek (Mar. 17, 2023), http://bit.ly/3JDFktH; Sabela Ojea, *Tegna Shares Plunge 25% as FCC Seeks Hearing on Standard General Deal*, Dow Jones Newswires (Feb. 24, 2023), http://bit.ly/3lIYm9P.

And by failing to refer the ultimate question whether the applications should be granted to the ALJ, the Media Bureau ensured that even the hearing's conclusion would not spell the end of the review process. After the completion of the hearing, the broadcasters would be where they are now:  with the Commission still having to decide the public interest question, and no prospect of any additional pertinent information in the offing.  The inevitable effect of the exercise is to kill the merger sub silentio while blocking judicial review.

5.    Faced with the effective denial of their applications, the broadcasters promptly pursued every available avenue to exhaust any

potentially available administrative remedies.  On March 3, in accordance with the Commission's regulations, the broadcasters first asked the ALJ to certify the Hearing Order directly to the Commission for immediate review.  Add. 969-994; see 47 C.F.R. § 1.115(e).  On March 16, the ALJ denied the motion.  Add. 1039-1042.

The following day (March 17), the broadcasters moved the Commission to waive its rules requiring ALJ certification, so as to permit an immediate appeal to the Commission.  Add. 1043-1044.  In the alternative, the broadcasters asked the Commission to exercise its authority to reclaim power delegated to the Media Bureau.  *Ibid.*  Either way, the broadcasters asked the Commission to review and reverse the Hearing Order and to grant the applications.  Add. 1054-1090; see 47 C.F.R. §§ 1.3, 1.115(e), 1.117.

The broadcasters informed the Commission that, in light of the urgency of the transaction's impending deadline, they intended to seek judicial relief if the Commission failed to act by 5 p.m. on March 27, 2023 (today)—the statutory deadline for appealing the Media Bureau's Hearing Order under 47 U.S.C. § 402(b)-(c).  Add. 1044.  As of this filing, the Commission has not acted.

6.     The broadcasters accordingly seek relief from this Court. They have filed a notice of appeal under 47 U.S.C. § 402(b)-(c) (No. 23-1083), seeking direct review of the Hearing Order as a denial of their license-transfer applications.  The broadcasters separately filed a conditional petition for a writ of mandamus (No. 23-1084); that petition requests a determination that, to the extent the Court concludes that the Commission has not yet taken final action on the applications, its withholding of such action (and shunting of the applications to an unconstitutional proceeding) is unlawful, and seeks an order directing the Commission to act.  Through this motion, the broadcasters request expedition of both cases to ensure that the Court's ability to adjudicate these important and pressing matters is not frustrated by the same agency delay that is directly at issue and that has engendered this unfortunate emergency posture.

## ARGUMENT

### I.    The Court Should Expedite This Appeal And Mandamus Petition

A party may seek expedited consideration of a case when "delay will cause irreparable injury" and "the decision under review is subject to substantial challenge."  D.C. Cir. Handbook of Practice & Internal Procedures 34 (2021).  Both considerations powerfully support expedition here.

#### A.    Delay Will Irreparably Injure The Broadcasters And The Public

In 56 days, financing commitments essential to the transaction will expire.  At that point, the transaction will be dead, and the Court, the Commission, and the broadcasters will be powerless to resuscitate it.  That outcome is certain unless the Court intervenes, as the Commission's Enforcement Bureau has conceded.  Add. 1034.

Expedition is therefore essential to prevent irreparable harm and ensure that this Court's review of the agency's conduct is not frustrated by the very delay that the broadcasters here challenge.  The default briefing and argument schedule would extend far past the May 22 final deadline to close the transaction.  At that point, this Court would be unable to grant meaningful relief.

16

Moreover, in the interim the broadcasters would be subject to an unconstitutional process—an adjudication before an Executive officer unlawfully insulated by three layers of for-cause removal protections. No prospect of judicial vindication of the broadcasters' structural constitutional rights would exist if the deal is allowed to die before proceedings in this court are completed.

The harmful effects of the Commission's unlawful actions would extend far beyond the broadcasters. The benefits of the transaction will inure to the public; the public, too, is harmed by the Commission's actions. Promoting "competition, localism, and viewpoint diversity" lies at the heart of the Commission's mandate to protect the public interest. *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1155 (2021). The merger, if approved, would serve each of those goals: it would create the largest-ever minority-owned, female-led television station group in the nation; expand opportunities for minority and female journalists; further competition by reducing TEGNA's market share; and boost investments in local news nationwide. And the Nation benefits if the deal can be completed, because a robust market for television media allows the press to better fulfill its "essential role in our democracy." *Pittsburgh Press Co.* v.

17

*Pittsburgh Commission on Human Relations*, 413 U.S. 376, 381-382 (1973) (citation omitted). All those benefits will be irreversibly lost unless this Court resolves this matter before April 21, 2023.

By expediting these proceedings, the Court would retain its ability to prevent those irreparable injuries and to correct the Commission's errors. Nor would expedition cause any cognizable harm to the Commission. Having elected to allow the Media Bureau's Hearing Order to put the deal on course for extinction, the Commission should be prepared to articulate and defend its reasons for doing so.

## B.    The Commission's Conduct Is Subject To Substantial Challenge

The Hearing Order is best understood as an effective denial of the broadcasters' license-transfer applications. As summarized in the broadcasters' notice of appeal, that denial is unlawful and should be overturned in the broadcasters' direct appeal. But even if the Court concludes that the Commission has not taken final action on the license-transfer applications, that withholding of final action is equally unlawful and warrants a writ of mandamus. Either way, the broadcasters have readily demonstrated substantial grounds for challenging the Commission's conduct.

18

1.    The Hearing Order is an unlawful denial of the broadcasters' license-transfer applications.

a.    The Hearing Order is final agency action subject to judicial review.  Finality requires action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) determines "rights or obligations" or causes "legal consequences [to] flow."  *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997) (citations omitted).  The inquiry is pragmatic and practical, not amenable to "self-implementing, bright-line rule[s]."  *National Ass'n of Home Builders* v. *U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279 (D.C. Cir. 2005).  The Hearing Order satisfies those criteria.

The Hearing Order marks the consummation of the Commission's decisionmaking process because the Commission's "actions suggest [it] has made up its mind" that the applications should be denied.  *Friedman* v. *FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016).  After more than a year of slow-rolling the applications, the Media Bureau ordered a hearing on legally irrelevant issues with full awareness that the procedure would spell the end for the applications.  And by declining to step in, the Commission effectively embraced the Bureau's decision as its own.  Even if the agency

19

did not "dres[s] its decision with the conventional procedural accoutre-ments of finality," it "has rendered its last word on the matter," and "its own behavior belies the claim that its [decision] is not final." *Whitman* v. *American Trucking Ass'ns*, 531 U.S. 457, 478-479 (2001) (citation omit-ted).

The Hearing Order also effectively determines the broadcasters' le-gal right to transfer station licenses. *National Association of Home Builders*, 417 F.3d at 1279 (permit decisions "carry easily-identifiable le-gal consequences"). That the Commission has withheld "formal acknowl-edgement" of that denial is immaterial because the "practical effect" of its action constitutes a "constructive denial" of the applications. *Fried-man*, 841 F.3d at 541-542. Under this Court's precedent, that is enough. *Environmental Defense Fund, Inc.* v. *Hardin*, 428 F.2d 1093, 1098-1099 (D.C. Cir. 1970) (order final where "administrative inaction ha[d] pre-cisely the same impact on the rights of the parties as denial of relief" because of "exigent circumstances").

b.    The Hearing Order is also unlawful several times over. At the outset, the Media Bureau attempted to scuttle the transaction by adopting an unconstitutional procedure, which the Commission declined

20

to countermand despite appeals by the broadcasters.  The Hearing Order directs a hearing (which could not be completed before May 22) to be conducted by the Commission's ALJ.  But that ALJ is insulated from presidential control in violation of Article II.  She is an inferior officer, *Lucia* v. *SEC*, 138 S. Ct. 2044, 2053-2054 (2018), but she enjoys *three* layers of for-cause removal protection, 5 U.S.C. § 7521(a) (ALJ); 5 U.S.C. § 1202(d) (Merit System Protection Board); 47 U.S.C. § 154(c)(1) (Commission).  Those restrictions unconstitutionally impair the President's power and duty to superintend her execution of the laws.  *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477, 484 (2010); *Jarkesy* v. *SEC*, 34 F.4th 446, 464 (5th Cir. 2022), petition for cert. pending, No. 22-859 (filed Mar. 8, 2023).

The Hearing Order is independently unlawful because the Commission lacks statutory authority to block a transaction on either of the grounds at issue in the hearing:  supposedly increased retransmission fees and decreased station-level employment.  The Commission does not have a "broad license to promote the general public welfare"; Congress obligated the agency to pursue "the purposes of the regulatory legislation."  *Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*, 595

21

F.2d 621, 624 (D.C. Cir. 1978) (en banc) (citation omitted).  Nothing in the Communications Act suggests that the agency can or should intervene in arm's-length private contracts or nondiscriminatory broadcasting employment practices.  And the FCC has long disclaimed such power. *Tribune Media Co.*, 2019 WL 4440126, at \*5 (F.C.C. Sept. 16, 2019); *Univision Holdings, Inc.*, 7 FCC Rcd 6672, 6683 n.45 (1992).  Because the issues designated for the hearing are legally irrelevant to the applications, the Media Bureau had no basis or authority to punt them to the ALJ.  The applications must be granted—or, at minimum, decided without regard to the inapposite issues that the Media Bureau attempted to inject.

Finally, even if the issues the Hearing Order identifies were legally relevant, there is no lawful basis on which to conduct a hearing because the challengers did not tender "specific allegations of fact," either "supported by affidavit" by witnesses with "personal knowledge" or concerning a proper subject of "official notice," on any "substantial" question that is "material" to whether the deal is compatible the public interest.  47 U.S.C. § 309(d)(1)-(2); see *Citizens for Jazz on WRVR, Inc.* v. *FCC*, 775 F.2d 392, 394-395 (D.C. Cir. 1985).  The petitions to deny contained only

22

"ultimate, conclusionary" facts and made "general allegations on information and belief," not even "supported by general affidavits." *Stone* v. *FCC*, 466 F.2d 316, 322 (D.C. Cir. 1972) (citation omitted).  And even if the petitions somehow made out a material factual issue, Standard General decisively resolved any issues by committing itself to keeping retransmission fees and staffing levels stable.  No hearing was justified.

2.    If the Court concludes, however, that the Hearing Order was not final because of the Commission's failure to memorialize formally the outcome its conduct has made inevitable, the Court should issue a writ of mandamus to the Commission directing it to adjudicate the applications in time to allow judicial review by May 22.  Mandamus is appropriate to "protect" the Court's own "future jurisdiction" to review agency action that would otherwise be frustrated by the Commission's "fail[ure] to resolve [the] disput[e]." *Telecommunications Research & Action Center* v. *FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) (*TRAC*); see 28 U.S.C. § 1651.  As set forth in the broadcasters' mandamus petition, the writ is warranted here because (1) the agency's delay—exacerbated by an unconstitutional hearing—violates a clear legal duty, (2) the delay is "so egregious" as to be unreasonable, and (3) the broadcasters have no adequate

alternative remedy. *In re Center for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (citation omitted).

a. The Communications Act obligates the Commission to grant or deny each license-transfer application it receives. 47 U.S.C. § 310(d). If the Hearing Order that the Commission has declined to disturb is not itself a decision on the applications, then the Commission has plainly failed to discharge its duty.

Moreover, the procedure the Media Bureau ordained would ensure that the Commission *cannot* reach a conclusion before the critical financing expires. That expiration will occur May 22—less than two months from today. The fastest transfer hearing in the last 30 years took 358 days; the average, 799 days. *Hicks Broadcasting of Indiana*, 13 FCC Rcd 10662 (1998) (358 days); *Petroleum V. Nasby Corp.*, 8 FCC Rcd 4035 (1993) (493 days); *Voice in the Wilderness Broadcasting, Inc.*, 17 FCC Rcd 17061 (2002) (512 days); *Patrick Sullivan*, 29 FCC Rcd 5421 (2014) (1,834 days). The Commission's Enforcement Bureau acknowledged before the ALJ that it would be "impossible" to resolve the applications by May 22. And the procedural cover the Media Bureau claimed—the ALJ hearing—is unlawful for all of the reasons explained above.

b.    The Commission's delay in acting is also egregious.  After slow-rolling the process for nearly a year, the Media Bureau interposed yet another procedural obstacle that, as just explained, it knows cannot be surmounted before the financing expires.  The Commission's conduct, if left unchecked, thus will have the inescapable effect of destroying the deal, without the FCC's having to explain its rationale on the record. Each of the factors *TRAC* identified to guide the assessment of the unreasonableness of agency delays confirm that conclusion.  750 F.2d at 80.

c.    Finally, if the Court concludes that the broadcasters' direct appeal under 47 U.S.C. § 402(b) cannot go forward, then they necessarily will have no adequate remedy.  See *In re Core Communications, Inc.*, 531 F.3d 849, 860 (D.C. Cir. 2008).

*****

The Commission has completely failed to fulfill its duty to adjudicate the applications.  Mandamus is warranted, and at minimum merits the Court's immediate attention.

## II.    The Court Should Consolidate The Appeal And Mandamus Petition

Consolidation is warranted for actions "involving essentially the same parties or the same, similar, or related issues."  D.C. Cir. Handbook

25

of Practice & Internal Procedures 24. Consolidating related actions helps "achieve the most efficient use of the Court's resources" and "maintain consistency in its decisions." *Ibid.* Consolidation of the broadcasters' appeal and mandamus petition is warranted here because both actions concern the same agency conduct and raise many identical legal issues. See *In re England*, 375 F.3d 1169, 1174 (D.C. Cir. 2004); *Wells Fargo Bank, N.A.* v. *FDIC*, 367 F.3d 953, 956 (D.C. Cir. 2004).

Additionally, consolidation is in the interest of judicial efficiency because the two actions present alternative theories of relief. Because the Court must decide which procedural path for review of the FCC's actions is appropriate—a direct appeal or a mandamus petition—the most straightforward and efficient way to do so is under one streamlined docket. See, *e.g.*, *In re Siler*, 571 F.3d 604, 608 (6th Cir. 2009).

## III.  The Court Should Resolve This Motion By April 3, 2023

The Court considers emergency motions on an expedited basis when, "to avoid irreparable harm, relief is needed in less time than would ordinarily be required for this court to receive and consider a response." D.C. Cir. R. 27(f). That is the case here. Expedited treatment of this motion is warranted for the same reasons expedition is essential for the

appeal and mandamus petition: without prompt judicial intervention, the transaction will die, the public will never enjoy the benefits of the merger, and the Commission's unlawful maneuvers will go unchecked. In addition, as explained above, the Court's own ability to adjudicate those weighty issues will evaporate unless it expedites these proceedings. Such expedition will be meaningful only if granted promptly.

Ordinarily, response and reply briefing once a motion is filed consumes 17 days, Fed. R. App. P. 27(a)(3)-(4), exclusive of the time before the motion is adjudicated. Deferring resolution of this motion by that length of time would be self-defeating.

The financing commitments, which are necessary for the transaction to close, expire in 56 days. The Commission's conduct has left much to be done in those eight remaining weeks. Not only must the Court consider and resolve one or both of these cases, but if the broadcasters prevail, the Commission would also need to take further action in response to the Court's ruling. For example, if the Court orders the Commission to consider and act upon the license-transfer applications anew (rather than directing it to grant the applications outright), additional time may be needed following that FCC action to allow the broadcasters to seek

and this Court to conduct judicial review.  The Court should not enable the Commission to render the Court's orders ineffectual by delaying further action on remand until the deal's deadline.

The broadcasters thus respectfully request that the Court resolve this motion by April 3, 2023.

## CONCLUSION

The broadcasters request that the Court expedite its consideration of these matters, issue an order setting the briefing and argument schedule proposed above, and consolidate the proceedings.

March 27, 2023.                           Respectfully submitted,

                                          _/s/ Miguel A. Estrada_____

Kevin F. King                             Miguel A. Estrada
Jennifer A. Johnson                       Counsel of Record
Jocelyn G. Jezierny                       Jonathan C. Bond
COVINGTON & BURLING LLP                   GIBSON, DUNN & CRUTCHER LLP
One CityCenter                            1050 Connecticut Avenue, N.W.
850 Tenth Street, N.W.                    Washington, D.C.  20036
Washington, D.C.  20001                   (202) 955-8500
(202) 662-6000                            mestrada@gibsondunn.com

*Counsel for Appellant*                   Stephen J. Hammer
*TEGNA Inc.*                              GIBSON, DUNN & CRUTCHER LLP
                                          2001 Ross Avenue, Suite 2100
                                          Dallas, TX  75201
                                          (214) 698-3100

David E. Mills                            Scott R. Flick
Michael D. Basile                         Jessica T. Nyman
Henry H. Wendel                           PILLSBURY WINTHROP
COOLEY LLP                                  SHAW PITTMAN LLP
1299 Pennsylvania Avenue, N.W.            1200 Seventeenth Street, N.W.
Suite 700                                 Washington, D.C. 20036
Washington, D.C.  20004                   (202) 663-8000
(202) 842-7800

*Counsel for Appellant*                   *Counsel for Appellant*
*CMG Media Corporation*                   *SGCI Holdings III LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this motion complies with the applicable typeface, type style, and type-volume limitations. This motion was prepared using a proportionally spaced type (New Century Schoolbook, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this motion contains 5,189 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this motion.

March 27, 2023                    Respectfully submitted,

                                        /s/ Miguel A. Estrada
                                    Miguel A. Estrada
                                    GIBSON, DUNN & CRUTCHER LLP
                                    1050 Connecticut Avenue, N.W.
                                    Washington, D.C. 20036
                                    (202) 955-8500
                                    mestrada@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on March 27, 2023, I electronically filed the foregoing motion with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the forgoing motion to be served by FedEx overnight service and by electronic mail on the Commission and on parties to the proceedings before the Commission as follows:

**Federal Communications Commission**
Attn: General Counsel
45 L Street, N.W.
Washington, D.C. 20554
litigationnotice@fcc.gov

**United Church of Christ Media Justice Ministry**
c/o Cheryl A. Leanza
100 Maryland Avenue, N.E.
Washington, D.C. 20002
cleanza@alhmail.com

**Common Cause**
c/o Yosef Gettachew
Jonathan Walter
805 15th Street N.W., Suite 800
Washington, D.C. 20005
ygetachew@commoncause.org
jwalter@commoncause.org

**NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA**
c/o Andrew J. Schwartzman
4000 Cathedral Avenue, N.W.
Apt. 617B
Washington, D.C. 20016
andyschwartzman@gmail.com

c/o David Goodfriend
The Goodfriend Group
208 I Street, N.E.
Washington, D.C. 20002
david@dcgoodfriend.com

c/o Arthur Belendiuk
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W.
Suite 301
Washington, D.C. 20016
abelendiuk@fccworld.com

March 27, 2023

Respectfully submitted,

_/s/ Miguel A. Estrada_
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**

## CHECKLIST FOR EMERGENCY MOTIONS

Type of motion: Expedite/Consolidate    When will it be filed? Date: 03-27-2023    Time: 5:00 p.m.

Disposition needed by: Date: 04-03-2023    Time: 5:00 p.m.    Why? time-sensitive merger

Will the motion be served by hand? ○ Yes ● No    If not, why not? After business hours; FedEx and email

Date of Lower Court/Agcy Decision: 02-24-2023    When will copies be provided to the court? 03-27-2023

Status of Lower Court/Agency proceedings: Applications designated for hearing before FCC ALJ

Any hearings scheduled? ● Yes ○ No    When? TBD

Status of motion for stay/injunction pending appeal filed with lower court or agency? N/A

Is there a case pending in USCA now? ● Yes ○ No    Case No. and Caption: 23-1038 & 23-1084

When will disclosure statements be filed? 03-27-2023

If a Notice of Appeal or Petition for Review has not been filed, when will one be?

Brief description of the case: (What is happening & when?):
Action challenging FCC's effective denial of/unreasonable delay in adjudicating applications to transfer broadcast licenses as part of a media merger. Financing for the merger expires May 22, 2023.

Name of counsel: Miguel A. Estrada

Office #: ( 202 ) 530-9616    Home #: (    ) -    Fax #: ( 202 ) 467-0539

Name of opposing counsel: Jake Lewis, Scott Noveck, and Jim Carr

Office #: ( 202 ) 415-0200    Home #: (    ) -    Fax #: ( 202 ) 418-2822

Comments:

**FOR CLERK'S OFFICE USE ONLY** Deputy Clerk: _____    Date: _____

Who is notified in LD? _____    Time: _____

## ROUTING

Staff Attorney Assigned: _____    Other: _____

Clerk ____    Ch. Deputy Clerk ____    LD Office ____    Team Leader ____    Supv/Op Unit ____    Intake