Nos. 23-1083 and 23-1084

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, APPELLANTS

*v.*

FEDERAL COMMUNICATIONS COMMISSION, APPELLEE

───────────────────────────

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, PETITIONERS

───────────────────────────

**SUPPLEMENTAL ADDENDUM**

───────────────────────────

Andrew J. Schwartzman               Arthur V. Belendiuk
4000 Cathedral Avenue, N.W.         Smithwick & Belendiuk, P.C.
Apt. 617B                           5028 Wisconsin Ave. N.W.
Washington, D.C. 20016              Suite 301
                                    Washington, DC 20016

Table of Contents

Opposition To Unauthorized Application For Review …………………………………………3

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consent to Transfer Control of Certain Subsidiaries | ) | MB Docket No. 22-162 |
| of TEGNA Inc. to SGCI Holdings III LLC | ) | |
| | ) | LMS File Nos. 0000186355 et al. |
| Consent to Transfer Control of Certain Subsidiaries | ) | |
| of Community News Media LLC to CMG Media | ) | |
| Operating Company, LLC | ) | LMS File Nos. 0000186354 et al. |
| | ) | |
| Consent to Transfer Control of Television Station | ) | |
| WFXT(TV), Boston, MA, from a Subsidiary of | ) | LMS File No. 0000186353 |
| CMG Media Operating Company, LLC to SGCI | ) | |
| Holdings III LLC | ) | |
| | ) | |
| Consent to Assign Licenses from Certain | ) | LMS File Nos. 0000186458 et al. |
| Subsidiaries of TEGNA Inc. to Subsidiaries of | ) | |
| CMG Media Corporation | ) | |

To:     Marlene H. Dortch, Secretary
         The Commission
Attn:   Administrative Law Judge Jane Hinckley Halprin

## OPPOSITION TO UNAUTHORIZED APPLICATION FOR REVIEW

Arthur V. Belendiuk                    Andrew Jay Schwartzman          David Goodfriend
Kenneth Levy                            1341 G Street, NW                   The Goodfriend Group
Smithwick & Belendiuk, P.C.        Fifth Floor                             208 I Street, NE
5028 Wisconsin Ave., N.W. #301   Washington, DC 20005              Washington, DC 20002
Washington, D.C. 20016
*Counsel for The NewsGuild-CWA and National Association of Broadcast Employees and*
*Technicians-CWA*

Cheryl A. Leanza                        Yosef Getachew
100 Maryland Avenue, NE              805 15th Street NW, Suite 800
Washington, DC 20002                  Washington, DC 20005
*Counsel for United Church*           *Counsel for Common Cause*
*of Christ Media Justice Ministry*

March 24, 2023

**TABLE OF CONTENTS**

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Applicants Blame Everyone but Themselves for Their Own Self-Selected
    Deadlines and Failure to Provide Information Despite the Staff's Invitation
    to Supplement the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Hearing Designation Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.   BECAUSE THE APPLICANTS' CLAIMED NEED FOR RELIEF IS PREMISED
    ON A PURPORTED "RIGHT" TO HAVE FINAL COMMISSION ACTION BY
    MAY 22, 2022, THE UNAUTHORIZED APPLICATION FOR REVIEW CAN BE
    DENIED ON THAT BASIS ALONE WITHOUT THE NEED EVEN TO
    CONSIDER OTHER ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Time is not of the essence. The self-selected May 22 deadline does not create
       a harm that the Commission must address . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.   The Relief the UAFR Seeks Is Incompatible with the Petitioners' Rights to a
       Participate in a Full Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.  THE HDO PROPERLY FOUND OUTSTANDING SUBSTANTIAL AND
    MATERIAL QUESTIONS AS TO TWO ISSUES. . . . . . . . . . . . . . . . . . . . . . . 12

    A.   Whether the Involvement of Two Competing Licensees in These
       Transactions Will Permit Them to Raises Retransmission Rates That Will Be
       Passed on to Members of TNG-CWA/NABET-CWA and Other Members of
       the Public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.   Whether approval of the applications will impede the Commission's core
       Localism objectives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. IN LIGHT OF THE LIMITED SCOPE OF THE HEARING DESIGNATION
    ORDER AND THE COMMISSION'S ALTERNATIVE MECHANISMS FOR
    CONDUCTING HEARINGS, THIS CASE DOES NOT IMPLICATE ARTICLE II
    OF THE CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

## SUMMARY

Much of the unauthorized Application for Review ("UAFR") rehashes the Applicants' contrived grievances about how the staff has mistreated them. But if there is one truly unprecedented element of this case, it is that the Applicants were afforded extraordinary opportunities to put more information into the record.

The core premise of the UAFR is that the Applicants entered into a contract that terminates on May 22, 2023, and that no extension of that date is possible. Selecting that date was the Applicants' mistake. The Commission is under no obligation to solve their problem, which could only be at the expense of the Petitioners' statutory right to participate in a full hearing. For reason alone, the UAFR should be summarily dismissed.

This is not a garden variety transfer case; it proposes a series of transfers among three parties concocted to game the Commission's retransmission consent rules. The injection of a non-TEGNA station from a third party which would then take nominally non-voting equity in post-transaction TEGNA creates several questions that must be explored at hearing. Because the Petitioners to Deny submitted evidence showing that increased retransmission fees are passed on to pay-TV subscribers in the form of increased rates, they have demonstrated that there would be harm to consumer welfare, and thus to the public interest.

The Petitions to Deny, and other evidence that comes from the Applicants' own documents, indicate that transferee Standard General would help finance its operations by reducing its salary and other costs by cutting TEGNA jobs, thereby reducing local service and impeding the Commission's core localism goal. This, too requires exploration at hearing.

The Media Bureau's regulatory humility emended to the limited nature of the Hearing

-ii-

Designation Order. Many designation orders contain an "ultimate issue" directing the ALJ to determine whether the evidence adduced justifies grant of the applications. However, there was no such directive in this case.

Thus, the Applicants' effort to inject a constitutional issue fails at the starting gate. Even if the use of ALJs at other agencies might present Article II issues in some cases - something petitioners do not concede - there is no such problem here. Because the "ultimate issue" was not delegated to the ALJ, in this case the ALJ is functioning essentially as any other Commission employee conducting an investigation. The final decision of whether to grant the applications pursuant to Section 309 of the Communications Act will be made by the Commission, which unquestionably has the constitutional authority to do so.

Moreover, in the hypothetical circumstance that the appointment of the FCC's ALJ were deemed suspect, existing FCC rules provide alternative mechanisms for resolving designated issues without an ALJ. Caselaw holds that principles of constitutional avoidance would allow remediation of any perceived problems using those existing alternative procedures.

## OPPOSITION TO UNAUTHORIZED APPLICATION FOR REVIEW

The NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA (collectively, TNG-CWA/NABET-CWA), United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry and Common Cause (all collectively, "Petitioners") by their attorneys, hereby oppose the unauthorized "Application for Review of Hearing Designation Order" ("UAFR ") filed by SGCI Holdings III LLC ("Standard General"), TEGNA Inc. ("TEGNA"), and CMG Media Corporation ("CMG," and collectively, the "Applicants").[1]

The Applicants set forth a selective version of the history of this proceeding, maintaining that they were overly burdened by having to submit additional documentation at the request of the Media Bureau.[2] This is consistent with the tone they have employed all along, complaining that other broadcast transactions - none of which involved financing provided by a competing broadcaster or a unique multi-step structure created to exploit retransmission consent contracts - were resolved more quickly than this one.[3]

---

[1]TNG-CWA/NABET-CWA have separately filed a Motion to Strike Application for Review and Opposition to Motion for Waiver as their response to the Applicants' extraordinary effort to circumvent the Commission's procedural rules through "Motion for Waiver of Sections1.115(e) and 1.115(f) of the Commission's Rules and Expedited Review." Unlike the Applicants, TNG-CWA/NABET-CWA do not have the resources to hire an army of attorneys to prepare a truncated 5 page version of this Opposition. The Commission should deny the requested waivers, but to the extent that it allows the filing of any Application for Review, it should accept this over-length Opposition.

[2]See UAFR at p.2 (n. omitted). ("While the deal that Applicants negotiated allowed for significantly more time than an FCC review of the rule-compliant Transactions should have taken (more than double the FCC's 180-day shot clock), the Applications have faced an extraordinary and unprecedented series of delays (42 days before initial public notice, 3 comment cycles, 2 document productions and 44 days of extensions for petitioners), and then an 11th hour HDO which, if not reversed, will kill the deal.")

[3]The Applicants' presumptuousness is reminiscent of what then-Judge Burger said in the context of a license renewal more than 60 years ago in *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994, 1003 (D.C. Cir. 1966): "After nearly five decades of

Much of this revisionist history is performative, clearly not directed to the Commission. Rather, it is a rehashing of the Applicants' grievances about what they view as the unfair and prejudicial way the staff has handled this proceeding. If there is one truly unprecedented aspect of how the Media Bureau treated the Applicants, it is that the staff afforded them extraordinary opportunities to put more information into the record to resolve possible factual issues it identified without having to go to hearing. Nonetheless, based on a large record, the Media Bureau concluded that the applications could not be approved without a hearing.

The UAFR should be immediately dismissed. Even if that filing were to be given any consideration, it would not be necessary to go behind the false premise underlying the UAFR - the notion that the self-selected May 22, 2022 termination date - which the applicants and their lenders agreed to in arms-length private negotiations - is somehow a deadline that binds the FCC to complete this proceeding by that date. The remainder of the UAFR is no less meritorious, and it should be promptly denied.

## BACKGROUND

The UAFR is a desperate effort to distract the Commission from what is actually at issue here: that the Applicants have failed to meet their statutory burden of demonstrating that the record they established justifies a finding that grant of their multiple applications is in the public interest.

The Applicants' effort to inject a constitutional issue fails at the starting gate. They wish to argue that the apppointment of the ALJ violates Article II. Even if the FCC's ALJ were ever

---

operation the broadcast industry does not seem to have grasped the simple fact that a broadcast license is a public trust...."

-2-

determined to be without authority to conduct a hearing, existing FCC rules set out an alternative mechanism for resolving designated issues without an ALJ. Adopting this procedure in lieu of using an ALJ could not possibly lead to final action by May 22, 2023. Moreover, the limited and purely factual nature of the issues delineated in the Hearing Designation Order ("HDO") does not implicate Article II issues. In any event, if considered on the merits, the constitutional challenge would fail.

## The Transaction

This is not a garden variety transfer of control of a broadcast licensee. Rather, it is a number of applications proposing a series of numbingly complex transfers between and among three companies. Not surprisingly, the HDO determined that this unorthodox package raises many substantial and material questions of fact that require a hearing for resolution.

Perhaps the most significant aspect of the UAFR is its failure even to allude to, much less describe and justify, the highly unusual structure of the proposed transactions here at issue. The HDO required three full paragraphs just to set out a high-level description of the carefully sequenced transactions. Oversimplified, the Applicants seek approval of a complicated series of transactions that would start when a CMG subsidiary that controls CMG's Boston TV station acquires TEGNA. Standard General would then acquire the newly created 65 station group. Then, CMG would acquire Standard General's existing four station TV group and four of TEGNA's TV stations. In the end, the deal would allow one of the largest private equity firms in the country, Apollo Global Management ("AGM"), through its de facto control of CMG, to acquire a substantial, nominally non-voting, interest in post-transaction TEGNA. It would do so while still holding de facto control of CMG's 13 full-power owned or operated TV stations, six of

-3-

which are in markets that overlap TEGNA holdings.

It is undisputed that the goal of including the Boston station in the deal was to allow both Standard General and CMG to benefit from a contractual provision that would have enabled post-transaction TEGNA to circumvent the FCC's retransmission consent rules to increase retransmission fees. Those increased fees would then be passed on to Pertitioners' members and the rest of the viewing public. Petitioners showed that the unusual deal structure could allow Standard General and CMG to circumvent the Commission's retranmission consent rules by sharing information and otherwise collaborating on various contractual negotiations on programming, labor relations and other matters.[4] While it is obvious how this might be mutually beneficial, it would be especially so in light of CMG's equity interest in post-transaction TEGNA.

TNG-CWA/NABET-CWA also presented evidence, much of which comes from the Applicants' documents submitted to the Commission, indicating that Standard General would help finance its operations by reducing its salary and other costs by cutting TEGNA jobs, thereby reducing local service and impeding the Commission's core localism goal.

**The Applicants Blame Everyone but Themselves for Their Own Self-Selected Deadlines and Failure to Provide Information Despite the Staff's Invitation to Supplement the Record.**

The Applicants contend in their UAFR that there has been inordinate delay in the processing of their applications.[5] In fact, the petitioners in this proceeding have taken action that are likely have accelerated development of a complete record. As discussed more fully below, the extended pendency of this matter is largely a consequence of the Applicants' failure to submit

---

[4]*See, e.g.*, See Comments of the NewsGuild-CWA, National Association of Broadcast Employees and Technicians- CWA, United Church of Christ, OC, Inc. Doing Business as United Church of Christ Media Justice Ministry and Common Cause, pp.20-22 (January 13, 2023).

[5]*See, e.g.*, UAFR, p.2.

-4-

necessary information to justify grant of the applications.

Following ordinary procedures for major transactions, the Commission issued a public notice that, inter alia, set a deadline of May 23, 2022 for filing petitions to deny.[6] Rather than wait until the petition to deny deadline to interpose objections that the applications were manifestly incomplete, two of the petitioner here, NewsGuild-CWA and Common Cause, joined by Public Knowledge, filed a detailed motion identifying what material information the applicants had not provided.[7] On May 20, 2022, the Media Bureau granted a "limited extension" of the petition to deny deadline to June, 22, 2022 to allow time to review the motion.[8] In a letter order dated June 3, 2022, the Media Bureau promulgated a detailed request for information to the Applicants which called for some of the materials that the petitioners said would be needed. The Media Bureau directed the Applicants to respond with a short 10 day deadline, until June 13, 2022, but "to maintain the [already] extended pleading cycle" did not further extend the petition to deny deadline.[9] On August 1, 2022, Petitioners filed a joint reply to the Applicants' opposition to their petitions to deny. They said, *inter alia,* that

> While the Letter Order did, in effect, grant the May 12, 2022 motion in part, the interim document requests it does contain are far more circumscribed than what is called for in the pending motion, and it did not act on several other categories of information essential to determining whether the proposed transactions are in the public interest.[10]

_____

[6]*Public Notice*, DA 22-443 (April 21, 2022).
[7]Motion for Additional Information and Extension of Time, filed by Common Cause, The NewsGuild-CWA, and Public Knowledge, filed May 12, 2022,
[8]*Public Notice*, DA 22-562 (May 20, 2022).
[9]*Letter to Scott R. Flick*, DA 22-603 (June 3, 2022).
[10]Reply to Applicants' Consolidated Opposition and Response to Comments of The NewsGuild-CWA, National Association of Broadcast Employees and Technicians-CWA, United Church of Christ Media Justice Ministry and Common Cause, p.25 (August 1, 2022)("Joint Reply").

The Petitioners then laid out nine specific categories of information without which the Commission "cannot determine the exact nature of AGM's relationship to Standard General...."[11] *Id.*, pp. 25-26. Although the Applicants could have voluntarily mooted the still-pending May 12, 2022 motion by voluntarily supplementing the record with the identified documents, they chose not to do so. Thus, upon review of the pleadings and the Applicants' submissions, on September 29, 2022, the Media Bureau issued a further request for documents and information, again setting tight deadlines for responses and any supplements to the petition to deny.[12]

It is critical to stress that, since the Applicants had failed to establish that grant is in the public interest, the Commission or staff could have simply designated a hearing at the completion of the initial pleading cycle. By identifying specific shortcomings in the record, the Petitioners in effect provided a road map for what the the Petitioners believed the Applicants would have to show to avoid a hearing. Even after receiving two such guides, the Applicants followed their own route, one which led to the designation of a hearing.

### The Hearing Designation Order

The HDO was issued within a month of the last substantive filings.[13] Exercising authority delegated by the Commission under Sections 0.61 and 0.283, the Media Bureau Chief wrote a

---

[11]*Id.*, pp. 25-26.

[12]*Letter to Scott R. Flick* (September 29, 2022).

[13]The staff's final consideration of the record was likely delayed by several weeks because, just before the Christmas holidays, in what was clearly a desperate attempt try to remediate the manifest flaws in the applications, Standard General submitted three unsolicited letters making various new proposals. The staff acted with alacrity; by the end of the day on December 23, the very same day that the third letter was submitted, the staff requested public comment on the new submissions. *Media Bureau Seeks Comment on Letters Filed by SGCI Holdings III LLC and Standard General L.P. Regarding Applications to Transfer Control of TEGNA, INC.*, DA 22-1368 (December 23, 2022). It directed that comments were to be filed on January 13, 2023, and replies were to be submitted by January 20, 2023.

-6-

comprehensive 23 page order, using 143 footnotes to provide citations and authority in support of the text. After rejecting challenges to Petitioners' standing, the HDO described in copious detail the disputed matters in each of two specified issues, thus requiring a hearing to determine whether grant of the applications were in the public interest.[14] This precluded grant of the applications on the basis of the applications as supplemented and the pleadings.[15]

For the last several years, perhaps in part because of the ongoing COVID epidemic, the Commission has used recently modified agency procedural rules,[16] to have most hearings conducted by means of paper submissions. However, not surprisingly in light of the magnitude of the proposed transactions, the HDO gave the Applicants the benefit of being able to appear in person to present their evidence to carry their burden of proof and to attempt to resolve the questions of fact in their favor.[17]

The Commission often specifies an "ultimate issue" in its designation orderes.[18] For example, in *Tribune Media Company and Sinclair Broadcast Group,* the Commission identified three issues for resolution and then directed the ALJ to determine the "ultimate issue":

---

[14]*See* 47 U.S.C. §309(e). ("If,...a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in [47 U.S.C. §309(a0), it shall formally designate the application for hearing....")

[15]*See* 47 U.S.C. §309(d)(2). ("If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest]...it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition,....")

[16]*See Procedural Streamlining of Administration of Hearings*, 35 FCC Rcd 10729 (2020).

[17]*See* 47 U.S.C. §309(e). ("he burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant,...")

[18]*See, e.g., Snake River Radio, LLC*, ID, No. 0000151021, (OHMSV (Feb. 8, 2022), 87 FR 9049 (Feb. 17, 2022) p, 3 para. 29(c); *Vandalia Media Partners 2*, LLC , 36 FCC Rcd 7012, 7019 (2022) para. 27(b); *NIA Broadcasting, Inc.* 36 F.C.C. Rcd 4864, 4871 (2021) para. 27(b).

-7-

Whether, in light of the evidence adduced on the issues presented, the above-captioned applications should be granted or denied.[19]

In this case, the Media Bureau did not specify such an ultimate issue. Rather, it simply directed the ALJ to make findings on two substantial and material questions of fact and then to send her findings for the Commission to assess whether in light of those findings, grant of the applications would be in the public inrest. As discussed below, the limited scope of this hearing does not implicate Article II of the Constitution.

## ARGUMENT

I.      **BECAUSE THE APPLICANTS' CLAIMED NEED FOR RELIEF IS PREMISED ON A PURPORTED "RIGHT" TO HAVE FINAL COMMISSION ACTION BY MAY 22, 2022, THE UNAUTHORIZED APPLICATION FOR REVIEW CAN BE DENIED ON THAT BASIS ALONE WITHOUT THE NEED EVEN TO CONSIDER OTHER ARGUMENTS**

It is not necessary for the Commission even to consider the substance of the arguments in the UAFR.

     A.      **Time is not of the essence. The self-selected May 22 deadline does not create a harm that the Commission must address.**

The central premise of the UAFR - that the Applicants are **_entitled_** to a final decision by May 22, 2023 - is fatally flawed. As the Applicants have themselves represented to the Commission:

> [T]he "Final Extension Date" of the Standard General-TEGNA merger agreement is May 22, 2023. That deadline will pass long before a full evidentiary hearing could be completed, and applicants have no ability to extend that deadline. If the Commission fails to grant the Applications before that date, the financing obligations of more than a dozen lenders helping to fund the transactions will expire as well.[20]

---

[19] _Tribune Media Company and Sinclair Broadcast Group,_ 33 FCC Rcd 6830, 6839 (2018),

[20] UAFR, p.ii.

It is correct that the TEGNA sales contract will terminate by its own terms on May 22, 2023. But it is utterly, wildly wrong for the Applicants to claim that, because of contract terms establishing a deadline they negotiated among themselves and with their lenders, "time is of the essence" and "The HDO in effect denies the Applications without basis and without due process"

Private parties do not dictate legal deadlines. Whether the Applicants can or cannot extend their loan commitments or find new lenders is entirely within their control. The initial sales agreement provided a termination date of November 22, 2022, but allowed the parties to avail themselves of two extensions of 90 days each. In arms-length private negotiations among themselves and their lenders, the parties could have selected a different termination date. They could have negotiated for three, four or more extensions. But they did not, fully aware of the complexities of the transactions and the need for regulatory approval.

In fact, the reason this proceeding has taken so long is because the Applicants have yet to meet their burden of demonstrating that grant of their applications would be in the public interest. A simple sale of TEGNA to a single qualified purchaser would likely have been approved as a matter of course. It is the *Applicants* who concocted a sequenced series of transactions of unprecedented complexity with the undenied purpose of increasing retransmission fees that would be passed on to the public, including TNG-CWA/NABET-CWA's members. It is the *Applicants* who chose to bring an additional non-TEGNA station into the deal, notwithstanding that the station is controlled by a competing licensee which would then hold an equity interest in post-transaction TEGNA, potentially in violation of FCC ownership rules. It is the *Applicants* whose internal documents raise serious questions as to whether they will impair the Commission's core localism goals by cutting job positions necessary to provide adequate local programming. It is the

-9-

*Applicants* who failed to take advantage of multiple opportunities to supplement the record to correct deficiencies, many of which were called to their attention within weeks of the filing of the applications, even before the initial deadline for petitions to deny. The Applicants should not have been surprised that consideration of this labyrinthine construct would take much longer than traditional simple applications for transfer of control.

The demand for final action by the artificial deadline the Applicants have tried to impose upon the Commission also ignores the statutory rights of the petitioners in this proceeding. The Applicants have proceeded as if they are the only parties in interest. Section 309(d)(1) expressly confers upon parties in interest the right to file petitions to deny,[21] and Section 309(e) gives them the right to participate in any designated hearing.[22] The HDO found that Petititioners are parties in interest,[23] a determination that the Applicants have conceded by not challenging it in their UAFR. A premature termination of this proceeding based on dates selected by the Applicants could only come by transgressing the Petitioners' rights.

In short, time is ***not*** of the essence, the very underlying premise of the UAFR is false, and that alone is sufficient reason to deny the UAFR. The Applicants are not entitled to a decision prior to an artificial date of their choosing. Whatever harm they face is of their own making, and they can fix it by amending their contracts. If, as they claim, their lenders will not accommodate extending their contractual deadline, that is their own fault,

---

[21]*See* 47 U.S.C. §309(d)(1). ("Any party in interest may file with the Commission a petition to deny any application....")
[22]*See* 47 U.S.C. §309(e). ("The Commission...shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue....")
[23]HDO, p.7

-10-

not that of the Media Bureau's.

**B.      The Relief the UAFR Seeks Is Incompatible with the Petitioners' Rights to a Participate in a Full Hearing.**

The Applicants blatantly assert that their ostensible, self-created "right" to a decision by May 22, 2023 is sacrosanct. They do so in complete disregard to the Petitioners' rights to have a hearing designated and then to participate in the hearing that has already been designated. Unlike the illusory "right" that the Applicants have alleged, the Petitioners' rights are genuine, created by Congress, not by counsel trying to avoid the consequences of a contract whose terms, in retrospect, their clients unwisely negotiated.

Section 309(d)(1) confers on "[a]ny party in interest" the right to file a petition to deny. Although the Applicants tried to argue that Petitioners lacked either associational or organizational standing, in the HDO, the Media Bureau found that each of the Petitioners have standing and designated them as parties in interest in the hearing.[24]

Under Section 309(e), if the Commission finds that there is

a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing****Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burdens shall be as determined by the Commission.

Accordingly, Section 309 confers a statutory right for parties in interest to participate in a hearing. It also makes plain that the burden of proof is upon the Applicants. Participation in a hearing includes the right to discovery and to challenge any evidence the Applicants may wish to

---

[24]HDO, p.7.

-11-

introduce.[25] By demanding that the Commission circumvent the statutorily mandated hearing, the UAFR seeks relief at the expense of the public interest Petitioners' statutory rights.

Applicants would set the clock back some six decades, to before the time that then-Judge Burger held that

> intervenors representing a public interest [should not] be treated as interlopers. Rather, if analogues can be useful, a "Public Intervenor" who is seeking no license or private right is, in this context, more nearly like a complaining witness who presents evidence to police or a prosecutor whose duty it is to conduct an affirmative and objective investigation of all the facts and to pursue his prosecutorial or regulatory function if there is probable cause to believe a violation has occurred.[26]

Despite the Applicants' claim that they are the only parties with rights at stake here, the days when the FCC could manifest "[a] curious neutrality-in-favor-of-the-licensee"[27] are long past. To the contrary,

> By whatever name or classification, broadcasters are temporary permittees-- fiduciaries-- of a great public resource and they must meet the highest standards which are embraced in the public interest concept.[28]

That is why there must be a hearing, and why the UAFR should be denied.

## II.   THE HDO PROPERLY FOUND OUTSTANDING SUBSTANTIAL AND MATERIAL QUESTIONS AS TO TWO ISSUES.

The HDO lays a strong legal and factual foundation to support the designated issues. As the HDO states, "Courts have stated that, in reviewing the record, the Commission must designate an application for hearing if 'the totality of the evidence arouses a sufficient doubt' as to whether grant of the application would serve the public interest." Despite the record developed,

---

[25]*See generally*, 47 CFR §§ 1.311-1.325.
[26]*Office of Communication of the United Church of Christ v. FCC*, 425 F.2d 543, 546 (D.C. Cir. 1969).
[27]*Id.*. 425 F.2d at 547.
[28]*Id.*. 425 F.2d at 548.

-12-

the HDO concluded that "there remain substantial and material questions of fact and based upon the record before us, we are unable to find that grant of these Transactions would be consistent with the public interest and therefore must investigate these issues further at hearing."

**A.    Whether the Involvement of Two Competing Licensees in These Transactions Will Permit Them to Raises Retransmission Rates That Will Be Passed on to Petitioners' Members and Other Members of the Public.**

The first designated issue concerns whether the convoluted transaction proposed in the applications would result in increased retransmission rates[29] for cable operator's rights to carry over the air broadcast signals and if those fees would be passed on to members of the public, including members of the Petitioners' organizations.

The Applicants point to past cases where the Commission has "declined to find 'that an increase in retransmission rates, by itself [*i.e.* rather than as a product of market power] is necessarily a public interest harm."[30] There are two material distinctions here.

First, change in retransmission rates arising from these transactions does not occur "by itself," and involves the exercise of market power. As the HDO says, "caselaw makes clear that increases in retransmission consent rates can constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace."[31] In this case, the mere transfer of control of the TEGNA stations might not have materially changed retransmission rates. But the Applicants included CMG's Boston TV station in the transaction for the undisputed

---

[29]Section 612 of the 1992 Cable Television Consumer Protection and Competition Act, 47U.S.C. § 534(a), provides a cable operator may not retransmit the signal of an over the air TV station without the prior written consent of the station. The provision also sets forth implementing procedures. FCC rules preclude improper collusion among broadcasters. See, e.g., DirecTV v. Deerfield Media, Inc.,

[30]UAFR at13-14 (citations and footnotes omitted).

[31]HDO, p.10.

-13-

purpose of triggering an after-acquired station clause that would enable post-transaction TEGNA to avail itself of the higher CMG retransmission rates. Moreover, CMG would then acquire nominally non-voting equity in post-transaction TEGNA. Thus, CMG would share in such success as TEGNA would enjoy as a result, and CMG and post-transaction TEGNA would have the opportunity to benefit from coordinated strategies in all manner of contractual negotiations on matters such as syndicated programming, advertising and, of particular relevance here, labor negotiations.[32] This is not an illusory problem; in fact, both CMG and TEGNA remain subject to a DOJ consent decree because of past collusion on advertising rates in violation of the Sherman Act.[33]

The involvement of CMG is also relevant to the Applicants' claim that the HDO does not find that TEGNA would have market power.[34] Assuming arguendo that this is a necessary element here, the UAFR focuses only on TEGNA, arguing that TEGNA would be smaller post-transaction. Leaving aside the unexplained assertion that TEGNA would somehow get smaller by shedding a few small market stations while acquiring a Fox affiliate in Boston, this overlooks the involvement of CMG, a major competitor, and that the combined power of the two companies with overlapping stations and common ownership interests would be relevant to any assessment of market power.

Second, as to the Applicants' assertion that there is no indication of how increased

---

[32]*See, e.g.*, Comments of the NewsGuild-CWA, National Association of Broadcast Employees and Technicians- CWA, United Church of Christ, OC, Inc. Doing Business as United Church of Christ Media Justice Ministry and Common Cause, pp.20-22 (January 13, 2023).

[33]*U.S. v. Sinclair Broadcast Group, Inc.*, 2019 WL 7584759 (2019)(TEGNA); *U.S. v. Sinclair Broadcast Group, Inc.*, 2019 WL 7584730 (2019)(Cox).

[34]UAFR, pp.13-14.

-14-

retransmission fees would harm consumer welfare, the UAFR overlooks a major difference between this case and the precedents on which they rely. In each of those cases, challenges were mounted by cable and satellite companies, and the Commission's decisions treated these as disputes as private contractual matters. However, in this case, TNG-CWA/NABET-CWA presented evidence, supported by sworn affidavits from their members, that they had faced increased pay-TV bills as a result of increased retransmission fees, along with evidence from billing and other public statements that increased retransmission fees are passed on to consumers, often with specific line item charges.[35] Those allegations, once proven at hearing, are surely harm to consumer welfare.

Nor is the retransmission consent question moot, as the Applicants contend. They insist that, because Standard General wrote a letter saying it wouldn't enforce the CMG after-acquired station clause, there is no live issue. But after Petitioners and other interested parties filed comments identifying remaining problems not addressed by the Standard General letter, the Bureau considered those arguments before concluding that substantial and material questions of fact are still present, and concluded that

> especially given questions about the intended scope of the commitments relating to enforcement of such clauses, we are unable to find that the commitments offered by the Applicants would adequately mitigate such a result.[36]

---

[35]*See. e.g*, Joint Reply, pp.32-33 and Exhibit D (including, inter alia, "This fee is called the Broadcast TV Surcharge and is a direct pass-through of what the local broadcast stations charge Home Telecom...."); Petition to Dismiss or Deny of the NewsGuild-CWA and National Association of Broadcast Employees and Technicians -CWA, pp.21-22; *id.*, p.22 n.13 (June 22, 2022) (quoting Spectrum spokesperson explaining rate increase, saying "As a direct result of the growing cost of programing from the TV networks we carry, we are passing through these increased fees to viewers.").

[36]HDO, p.12.

-15-

Yet again misconstruing the purpose of a hearing, the UAFR insists that "petitioners and commenters [have not] raise[d] any plausible concerns about the waiver." UAFR, p.17. That, of course, is precisely what the ALJ is charged to explore, and the Applicants will be able to try to show that these objections are misplaced.

### B. Whether Approval of the Applications Will Impede the Commission's Core Localism Objectives.

The second issue designated concerns localism. The ALJ was directed to consider

> Whether, and to what extent,...local content and programming in the affected communities would be adversely affected due to the proposed plans and commitments of SGCI Holdings for station-level staff; its intentions for investments in the stations; the potential financial pressures connected with the acquisition and ownership structure; and the potential effectiveness of the commitments offered by the Applicants.[37]

Relying on a decision relating to the FCC's equal employment rules, the Applicants trivialize and mischaracterize these precisely stated questions as improperly constituting an inquiry into "nondiscriminatory staffing decision."[38] This case most certainly does not involve hiring decisions, much less employment discrimination.  Even so, the Applicants portray the precedents as saying the Commission has no authority ever to examine whether reduction in employee headcounts can adversely affect a licensee's ability to provide programming that meets the needs of their communities of license. So, too, no precedent bars the Commission from taking into account a licensee's ownership structure and plans for investment.[39]

---

[37]HDO, p.22.
[38]UAFR, p.19.
[39]Both *Nexstar/Tribune Order*, 34 FCC Rcd 8436, 8453 n.138 (2019) and *NBI-Terrier Order*, 34 FCC Rcd 10554, 10568 (2019) rejected somewhat similar allegations which the Commission considered to be wholly speculative based on the absence of any supporting evidence. In this case, TNG-CWA/NABET-CWA presented extensive evidence from the Applicants' submissions, which are discussed at length in the HDO at pp.15-16.

-16-

In this case, TNG-CWA/NABET-CWA presented extensive evidence from the Applicants' submissions, which are discussed at length in the HDO at pp.16-18. This led the Media Bureau to conclude that

> The conflicting evidence on the record before us about SGCI Holdings' intentions and commitments with regard to local staffing at the TEGNA stations, leaves us with substantial and material questions of fact, unresolved by Applicants' filings, that require further investigation to determine the ultimate effects on localism.[40]

In this regard, the Bureau pointed, *inter alia,* to discrepancies in the record as to Standard General's "intent and commitments to reduce station-level staff," and "evaluation of [Standard General's] explanations that station-level savings have already been achieved."[41]

As to ownership structure, the HDO found that "the record indicates that two aspects of the ultimate ownership of New TEGNA also warrant further investigation."[42]  These are whether private equity and hedge fund vehicles benefit or harm the ability to provide public service, and the role of Standard General as a past station owner.[43]

The record as to this issue is of particular concern to Petitioners, who have shown that private equity investors have decimated the U.S. local newspaper industry. Their business model has been to seek short-term profits by reducing employee head counts and otherwise diminishing the quality and quantity of newspapers' products, and then selling out after a few years.[44] Given Standard General's track record of holding, then selling, Young Broadcasting in less than six years, and then buying and now seeking to sell its current four station TV group after less than

---

[40]HDO, p.18.
[41]*Id.*
[42]HDO, p.19.
[43]*Id.*, pp.18-19.
[44]See, *e.g.*, Petition to Dismiss or Deny of the NewsGuild-CWA and National Association of Broadcast Employees and Technicians -CWA, pp. 3-4 (June 22, 2022).

-17-

four years, there is considerable reason to explore this matter.

Following the same pattern as they have in the rest of the UAFR, the Applicants say that the HDO is wrong in its analysis of the record. But, yet again, they seek to ignore that the very purpose of a hearing is to explore discrepancies in the factual record. The Applicants will have every opportunity to submit their case before the ALJ.

## III.    IN LIGHT OF THE LIMITED SCOPE OF THE HEARING DESIGNATION ORDER AND THE COMMISSION'S ALTERNATIVE MECHANISMS FOR CONDUCTING HEARINGS, THIS CASE DOES NOT IMPLICATE ARTICLE II OF THE CONSTITUTION.

The Applicants have attempted to create a Constitutional issue in this case. There is no such issue here. They seek to invoke *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), a Supreme Court decision involving a unique accounting oversight board appointed by the Securities and Exchange Commission ("SEC") as required by Congress,[45] and *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), which found multiple flaws in an SEC Administrative Law Judge's assessment of severe penalties for securities fraud. It is an enormous stretch to argue that these decisions render the FCC's Office of Administrative Law Judges unconstitutional, or that this is a controlling question of law that the Commission must consider.

First, even if there ever was a genuine issue as to whether the powers of an FCC ALJ might be questioned under Article II of the Constitution in an adjudicatory matter under Section 309, a point TNG-CWA/NABET-CWA does not concede, it does not arise in this case. That is because, as explained above, the ALJ's function in this case is much more limited than in most cases

_____

[45]Motion to Certify Application for Review of Hearing Designation Order (March 3, 2023), pp.3*ff.*

-18-

designated under Section 309. Since the "ultimate issue" has not been referred to the ALJ, she is functioning here essentially as would any other FCC employee, making non-binding recommendations on essential but subsidiary issues that are appealable to the full Commission. She cannot herself issue a license pursuant to Section 309, so the next steps will be performed by the FCC or an FCC employee who lacks for cause removal protection and would therefore not implicate Article II.[46]

Second, and in any event, the Commission has established specific procedures allowing the full Commission en banc, a single Commissioner or an employee to be appointed as a "case manager to gather evidence for the Commission.[47] If a reviewing body ever determined that the appointment of the ALJ was suspect, principles of constitutional avoidance would allow the ALJ to be treated as a "case manager" in making her subsidiary findings of fact for the purposes of this case. Indeed, that is essentially what the Supreme Court did in the *Free Enterprise* case cited by the Applicants,[48] where it applied principles of constitutional avoidance to remedy a problem using existing agency structures. The D.C. Circuit afforded similar treatment in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Tribunal Board*, 684 F.3d 1322, 1340, finding that "invalidating and severing the problematic for-cause restriction was the best solution matching

---

[46]The Applicants point to TNG-CWA/NABET-CWA having indicated in their opposition to the Applicants' motion to certify that "the ALJ's function in this case is much more clearly that of an inferior officer...." TNG-CWA/NABET-CWA Opposition to Motion to Certify Application for Review of Hearing Designation Order. p.9 (March 9, 2023). This and a few other minor errors in the opposition were editorial mistakes resulting from the tight filing deadline for responding to a pleading raising so many flawed arguments.

[47]*Procedural Streamlining of Administrative Hearings,* 35 FCC Rcd 10729 (2020), Free Enterprise, 477 U.S. at 508-510; *id.* 477 U.S. at 508 ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem," severing any "problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of Northern New Eng.,* 546 U.S. 320, 328–329 (2006)).

-19-

the problem and preserving the remainder intact."

These distinctions are especially important here, because they underscore the Applicants'

massive overreach in the UAFR. Even it if it were found that the delegation to the ALJ to resolve

subsidiary issues and the appointment of the ALJ raised constitutional questions, they are not

entitled to their demand that the Commission "promptly grant the Applications."[49] One way or

another, there must be a hearing.

## CONCLUSION

The Commission should dismiss the UAFR as unauthorized.

To the extent the Commission does consider the UAFR, it deny it on the basis that there is

no merit to the Applicants' claim that time of the essence and that the Commission is obligated to

rule to meet the deadlines established in the Applicants' privately-negotiated contracts.

If the Commission were to consider other arguments in the UAFR, it should deny the

UFAR for the reasons stated above.

Respectfully Submitted,

/s/ Cheryl A. Leanza                     /s/Arthur V. Belendiuk
Cheryl A. Leanza                         Arthur V. Belendiuk
100 Maryland Avenue, NE                   Kenneth Levy
Washington, DC 20002                     Smithwick & Belendiuk, P.C.
*Counsel for United Church*               5028 Wisconsin Avenue, N.W.
*of Christ Media Justice Ministry*        Suite 301
(202) 841-6033                           Washington,D.C. 20016
                                         abelendiuk@fccworld.com
                                         (202) 363-4559
Yosef Getachew
805 15th Street, NW, Suite 800
Washington, DC 20005
(301) 785-7393
*Counsel for Common Cause*
ygetachew@commoncause.org

---

[49]UAFR, p. 25.

/s/Andrew Jay Schwartzman
Andrew Jay Schwartzman
1341 G Street, NW - Fifth Floor
Washington, DC 20005
AndySchwartzman@gmail.com
(202) 812-3210

/s/ David Goodfriend
David Goodfriend
The Goodfriend Group
208 I Street, NE
Washington, DC 20002
David@dcgoodfriend.com
(202) 549-5612
Counsel for TNG-CWA/NABET-CWA

March 24, 2023

## CERTIFICATE OF SERVICE

I hereby certify that, on March 29, 2023, I electronically filed the foregoing Supplemental Addendum with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing Addendum to be served by first class and electronic mail on the FCC and on parties to the proceedings as follows:

**Federal Communications Commission**
Attn: General Counsel
45 L Street, N.W.
Washington, D.C. 20554
litigationnotice@fcc.gov

Miguel A. Estrada
Counsel of Record
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER
LLP 1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

**SGCI Holdings III LLC**
Scott R. Flick
Jessica Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC  20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com

**TEGNA, Inc.**
Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001
jjohnson@cov.com
Jjezierny@cov.com

**CMG Media Corporation**
Michael D. Basile
Jason Radermacher
Henry Wendel
Cooley LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
mdbasile@cooley.com
jrademacher@cooley.com
hwendel@cooley.com

Respectfully Submitted:
/s/ Andrew Jay Schwartzman
4000 Cathedral Avenue, N.W. Apt. 617B
Washington, D.C. 20016

March 29, 2023

## CERTIFICATE OF SERVICE

I hereby certify that, on March 29, 2023, I electronically filed the foregoing Supplemental Addendum with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing petition to be served by FedEx overnight service and by electronic mail on the Commission and on parties to the proceedings before the Commission as follows:

**Federal Communications Commission**
Attn: General Counsel
45 L Street, N.W.
Washington, D.C. 20554
litigationnotice@fcc.gov

**SCGI Holdings III, LLC**
Miguel A. Estrada
Counsel of Record
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER
LLP 1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

Scott R. Flick
Jessica Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC  20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com

**TEGNA, Inc.**
Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001
jjohnson@cov.com
Jjezierny@cov.com

**CMG Media Corporation**
Michael D. Basile
Jason Radermacher
Henry Wendel
Cooley LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
mdbasile@cooley.com
jrademacher@cooley.com
hwendel@cooley.com

Respectfully Submitted:

/s/ Andrew Jay Schwartzman

March 29, 2023