No. 23-1083

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, APPELLANTS

*v.*

FEDERAL COMMUNICATIONS COMMISSION, APPELLEE,

and

COMMON CAUSE, *et al.*, INTERVENORS FOR APPELLEE.

On Appeal of an Order of the
Federal Communications Commission

## OPENING BRIEF FOR APPELLANTS

Kevin F. King
Jennifer A. Johnson
Jocelyn G. Jezierny
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
(202) 662-6000

*Counsel for Appellant
TEGNA Inc.*

Miguel A. Estrada
    *Counsel of Record*
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Appellant
SGCI Holdings III LLC*

*[Additional Counsel Listed On Inside Cover]*

David E. Mills
Michael D. Basile
Henry H. Wendel
COOLEY LLP
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20004
(202) 842-7800

*Counsel for Appellant*
*CMG Media Corporation*

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Scott R. Flick
Jessica T. Nyman
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
(202) 663-8000

*Counsel for Appellant*
*SGCI Holdings III LLC*

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), appellants SGCI Holdings III LLC, TEGNA Inc., and CMG Media Corporation certify as follows:

**A.    Parties**

**Appellants:**  SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Appellee:**  Federal Communications Commission

**Intervenors:**    The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.

**B.    Rulings Under Review**

The ruling at issue is the February 24, 2023 hearing designation order issued by the Media Bureau of the Federal Communications Commission.  Hearing Designation Order, *Consent to Transfer Control of Certain Subsidiaries of TEGNA, Inc. to SGCI Holdings III LLC*, MB Docket No. 22-162, DA 23-149 (Feb. 24, 2023).  The ruling is not yet reported, but can be found in the Appendix at 938 and at 2023 WL 2300341 (F.C.C. Feb. 24, 2023).

## C.    Related Cases

This case is related to a petition for mandamus in *In re SGCI Holdings III LLC*, No. 23-1084, filed concurrently with this appeal, which arises from the same Federal Communications Commission proceeding.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellants disclose the following corporate parents:

SGCI Holdings III LLC is a Delaware limited-liability company that serves as an investment vehicle.* Soohyung Kim is the sole managing member of SGCI Holdings III LLC. Standard General Master Fund II L.P., a Cayman Islands limited partnership, owns 20.4% of the equity of SGCI Holdings III LLC. Standard General Master Fund II L.P. is wholly controlled by Standard General L.P., a Delaware limited partnership. Standard General L.P. is wholly controlled by Standard General Holdings L.P., a Delaware limited-liability company, which is in turn wholly controlled by Standard General S. Corp., a Delaware corporation. Standard General S. Corp. is wholly controlled by Acme Amalgamated Holdings LLC, a Delaware limited-liability company. No corporation owns more than 10% of Acme Amalgamated Holdings LLC. SGCI Holdings LLC, a Delaware limited-liability company, owns 23.90% of the

---

 * This certificate represents the ownership status of SGCI Holdings III LLC as it currently stands. It therefore deviates from the ownership structure described in the applications to the Commission, which show the company's post-closing owners.

equity of SGCI Holdings III LLC.  SGCI Holdings LLC, is wholly controlled by Standard General L.P.  EPSG Master SPC Ltd., a Cayman Islands limited corporation, owns 39.1% of the equity of SGCI Holdings III LLC.  EPSG Master SPC Ltd. is wholly controlled by EPSG SPC Ltd., a Cayman Islands limited corporation.  EPSG SPC Ltd. is wholly controlled by Standard General L.P.  No other corporation owns more than 10% of the equity of SGCI Holdings III LLC.

TEGNA Inc. is a publicly traded Delaware corporation that provides media services.  The Vanguard Group owns 10.52% of the stock of TEGNA Inc.  BlackRock, Inc. owns 12.2% of the stock of TEGNA Inc.  No other corporation owns more than 10% of the stock of TEGNA Inc.

CMG Media Corporation is a Delaware corporation that provides media services.  CMG Media Corporation is wholly owned by CMG Media Holdings II, Inc., a Delaware corporation.  CMG Media Holdings II, Inc., in turn, is wholly owned by CMG Holdings, Inc., a Delaware corporation.  AP IX Titan Holdings, L.P., a Delaware limited partnership, owns 71% of CMG Holdings, Inc.  AP IX Titan Holdings, L.P. is owned by funds managed by affiliates of Apollo Global Management, Inc. (AGM) and ultimately is controlled by AP IX (PMC) VoteCo, LLC (VoteCo), a Delaware

iv

limited liability company. AGM's common shares are publicly traded on the New York Stock Exchange (NYSE: APO). Neither VoteCo nor AGM have any parent companies, and no corporation owns more than 10% of either VoteCo or AGM. Cox Enterprises, Inc., a Delaware corporation, owns 19.8% of CMG Holdings, Inc. No publicly traded company owns more than 10% of the stock of Cox Enterprises, Inc. No other corporation owns more than 10% of CMG Holdings, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................viii

GLOSSARY .......................................................................................xvi

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF ISSUES ....................................................................6

STATUTES AND REGULATIONS ........................................................7

STATEMENT OF THE CASE ...............................................................7

SUMMARY OF ARGUMENT ...............................................................17

STANDING .......................................................................................20

STANDARD OF REVIEW ....................................................................21

ARGUMENT ......................................................................................22

    I.    The Commission Has Effectively Issued A Final
        Denial Of The Transfer Applications ...................................23

    II.   The Commission's Effective Denial Of The
        Applications Is Unlawful ......................................................31

        A.    The Denial Is Unlawful Because It Orders An
              Unconstitutional Hearing..............................................33

        B.    The Denial Is Unlawful Because It Rests Solely
              On Grounds That Exceed The Commission's
              Authority .......................................................................39

        C.    The Denial Is Unlawful Because It Was
              Supported By No Competent Evidence.........................47

## TABLE OF CONTENTS
### *(continued)*

III.   The Proper Remedy Is Reversal, Not Mere Remand............55

CONCLUSION ..........................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*United States ex rel. Accardi* v. *Shaughnessy*,
    347 U.S. 260 (1954) .............................................................. 51

*Alabama Ass'n of Realtors* v. *Department of*
    *Health & Human Services*, 141 S. Ct. 2485 (2021) ........................... 45

*American Federation of Government Employees, AFL-CIO*
    v. *Federal Labor Relations Authority*,
    778 F.2d 850 (D.C. Cir. 1985) ................................................ 59

*American Insurance Co.* v. *Canter*,
    26 U.S. (1 Pet.) 511 (1828) .................................................. 37

*Donovan ex rel. Anderson* v. *Stafford Construction Co.*,
    732 F.2d 954 (D.C. Cir. 1984) ............................................ 55, 56

*Attias* v. *Carefirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ................................................ 20

*Barrick Goldstrike Mines Inc.* v. *Browner*,
    215 F.3d 45 (D.C. Cir. 2000) ................................................. 28

* *Bennett* v. *Spear*,
    520 U.S. 154 (1997) ...................................................... 17, 24

* *Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*,
    595 F.2d 621 (D.C. Cir. 1978) ........................................ 39, 40, 44

*Checkosky* v. *SEC*,
    139 F.3d 221 (D.C. Cir. 1998) ............................................... 59

*Citizens for Jazz on WRVR, Inc.* v. *FCC*,
    775 F.2d 392 (D.C. Cir. 1985) ........................................ 42, 47, 48

*Authorities upon which we chiefly rely are marked with asterisks.*

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Clean Air Council* v. *Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ............................................................ 25, 29

*Cochran* v. *SEC*,
  20 F.4th 194 (5th Cir. 2021) ................................................................ 38

*Cohen* v. *Beneficial Industrial Loan Corp.*,
  337 U.S. 541 (1949) ............................................................................... 24

*Collins* v. *Yellen*,
  141 S. Ct. 1761 (2021) .......................................................................... 38

*Encino Motorcars, LLC* v. *Navarro*,
  579 U.S. 211 (2016) ............................................................................... 43

*Environmental Defense Fund, Inc.* v. *Hardin*,
  428 F.2d 1093 (D.C. Cir. 1970) .......................................... 18, 25, 28, 30

*FCC* v. *Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .......................................................... 33, 43, 45, 51

*FCC* v. *Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) .......................................................................... 57

*Fleming* v. *United States Department of Agriculture*,
  987 F.3d 1093 (D.C. Cir. 2021) ........................................................... 37

* *Free Enterprise Fund* v. *Public Company
  Accounting Oversight Board*,
  561 U.S. 477 (2010) ................................................. 6, 18, 33, 34, 35, 36

* *Friedman* v. *FAA*,
  841 F.3d 537 (D.C. Cir. 2016) ................................ 17, 25, 26, 27, 29, 30

*FTC* v. *Bunte Brothers, Inc.*,
  312 U.S. 349 (1941) ............................................................................... 47

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Gencom Inc.* v. *FCC,*
    832 F.2d 171 (D.C. Cir. 1987) ................................................. 53

*George Hyman Construction Co.* v. *Brooks,*
    963 F.2d 1532 (D.C. Cir. 1992) .............................................. 56

*Her Majesty the Queen in Right of Ontario* v. *EPA,*
    912 F.2d 1525 (D.C. Cir. 1990) .............................................. 25

\* *Jarkesy* v. *SEC,*
    34 F.4th 446 (5th Cir. 2022) ............................... 18, 36, 37, 38

*Lucia* v. *SEC,*
    138 S. Ct. 2044 (2018) ............................................ 34, 35, 37

*Mathews* v. *Eldridge,*
    424 U.S. 319 (1976) .............................................................. 24

*Middle Rio Grande Conservancy District* v. *Norton,*
    294 F.3d 1220 (10th Cir. 2002) ............................................ 59

*Morgan Stanley Capital Group Inc.* v. *Public
    Utility District No. 1,* 554 U.S. 527 (2008) ......................... 56

*Motor Vehicle Manufacturers Ass'n of the United
    States, Inc.* v. *State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983) ......................................................... 21, 39

*Myers* v. *United States,*
    272 U.S. 52 (1926) .............................................................. 34

*National Ass'n of Home Builders* v. *U.S. Army
    Corps of Engineers,*
    417 F.3d 1272 (D.C. Cir. 2005) ...................................... 24, 29

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*National Federation of Independent Business* v.
  *Department of Labor*,
  142 S. Ct. 661 (2022)..................................................................44

*National Organization For Women, New York
  City Chapter* v. *FCC*, 555 F.2d 1002 (D.C. Cir. 1977) .......................44

*NLRB* v. *Wyman-Gordon Co.*,
  394 U.S. 759 (1969)..................................................................56

*Physicians for Social Responsibility* v. *Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020)..................................................22

*Planned Parenthood Federation of America, Inc.* v. *Heckler*,
  712 F.2d 650 (D.C. Cir. 1983)..................................................21

*PSSI Global Services, LLC* v. *FCC*,
  983 F.3d 1 (D.C. Cir. 2020)......................................................5

*Ex parte Randolph*,
  20 F. Cas. 242 (C.C. Va. 1833)..............................................37

*Schoenbohm* v. *FCC*,
  204 F.3d 243 (D.C. Cir. 2000)................................................21

*Seila Law LLC* v. *CFPB*,
  140 S. Ct. 2183 (2020)............................................................33

*Sinclair Broadcasting Group, Inc.* v. *FCC*,
  284 F.3d 148 (D.C. Cir. 2002)................................................57

*Sioux Valley Hospital* v. *Bowen*,
  792 F.2d 715 (8th Cir. 1986)................................................56

*Stone* v. *FCC*,
  466 F.2d 316 (D.C. Cir. 1972)........................................48, 51

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*TransUnion LLC* v. *Ramirez*,
141 S. Ct. 2190 (2021)................................................................ 20

*Turner Broadcasting System, Inc.* v. *FCC*,
512 U.S. 622 (1994).................................................................... 40

\* *U.S. Army Corps of Engineers* v. *Hawkes Co., Inc.*,
578 U.S. 590 (2016)............................................................... 17, 24

*United Telephone Co. of Carolinas, Inc.* v. *FCC*,
559 F.2d 720 (D.C. Cir. 1977)................................................... 41

*West Virginia* v. *EPA*,
142 S. Ct 2587 (2022)................................................................ 47

*Whitman* v. *American Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001)............................................................. 28, 29

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. II, § 1, Cl. 1 ....................................................... 33

U.S. Const. Art. II, § 3 .................................................................. 33

## STATUTES

5 U.S.C. § 556 ....................................................................... 35, 36

5 U.S.C. § 557 ....................................................................... 35, 36

5 U.S.C. § 706 ........................................................... 21, 32, 33, 39

5 U.S.C. § 1202....................................................................... 35

5 U.S.C. § 3105 ..................................................................... 35, 36

5 U.S.C. § 7521..................................................................... 35, 37, 38

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

15 U.S.C. § 18a ................................................................. 8, 42

28 U.S.C. § 1291 .................................................................... 24

47 U.S.C. § 154 ....................................................................... 35

47 U.S.C. § 155 ....................................................................... 30

47 U.S.C. § 309 .............. 1, 10, 11, 20, 22, 23, 31, 39, 42, 47, 48, 51, 55, 58

47 U.S.C. § 310 ................................................... 1, 8, 10, 22, 39

47 U.S.C. § 325 ............................................................... 40, 53

47 U.S.C. § 402 .............................................................. 5, 16, 17, 23

47 U.S.C. § 534 ....................................................................... 40

## REGULATIONS

5 C.F.R. § 1201.137 ................................................................. 35

47 C.F.R. § 0.61 ...................................................................... 11

47 C.F.R. § 0.283 .............................................................. 43, 46

47 C.F.R. § 0.341 .............................................................. 35, 36

47 C.F.R. § 1.4 ........................................................................ 5

47 C.F.R. § 1.115 .............................................................. 16, 30

47 C.F.R. § 1.117 ..................................................................... 16

## RULES

Fed. R. App. P. 26 .................................................................... 5

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

**ADMINISTRATIVE PROCEEDINGS**

*Hicks Broadcasting of Indiana*,
  13 FCC Rcd 10662 (1998) ................................................... 14

*Meredith Corp.*,
  36 FCC Rcd 15870 (Nov. 12, 2021) ...................................... 9

*Patrick Sullivan*,
  29 FCC Rcd 5421 (2014) ..................................................... 14

*Petroleum V. Nasby Corp.*,
  8 FCC Rcd 4035 (1993) ........................................................ 14

*Quincy Media*,
  36 FCC Rcd 5544 (Mar. 12, 2021) ........................................ 9

*Raycom Media, Inc.*,
  33 FCC Rcd 12349 (2018) ..................................................... 41

*Rebel Broadcasting of Mississippi*,
  42 F.C.C.2d 499 (1973) ......................................................... 51

*Tribune Media Co.*,
  2019 WL 4440126 (F.C.C. Sept. 16, 2019) ...................... 41, 42, 43, 45

*Univision Holdings*,
  7 FCC Rcd 6672 (1992) ........................................................ 45

*Voice in the Wilderness*,
  17 FCC Rcd 17061 (2002) .................................................... 14

**LEGISLATIVE MATERIALS**

S. Rep. No. 92, 102d Cong., 1st Sess. (1991),
  *reprinted in* 1992 U.S.C.C.A.N. 1133 ................................. 41

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

**OTHER AUTHORITIES**

FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex Mergers*, bit.ly/3FcxUMe (last visited Mar. 30, 2023) ............................................................. 9, 12

Jon Schleuss, *Thank FCC Chair Rosenworcel for Saving Local News*, Newsweek (Mar. 17, 2023), bit.ly/3JDFktH ................. 14

PR Newswire, *Scripps Prices Senior Notes Offering*, bit.ly/3M0pETT (Dec. 15, 2020) ............................................................. 9

Sabela Ojea, *Tegna Shares Plunge 25% as FCC Seeks Hearing on Standard General Deal*, Dow Jones Newswires (Feb. 24, 2023), bit.ly/3lIYm9P ..................... 14

Standard General and TEGNA Facts, *Supporters*, bit.ly/3mI3Lyl (last visited Mar. 30, 2023) ......................................... 8

## GLOSSARY

Administrative Law Judge.....................................................................ALJ

Appellants' Appendix ............................................................................ App.

Federal Communications Commission................................................ FCC

Securities and Exchange Commission...................................................SEC

## INTRODUCTION

In the Communications Act, 47 U.S.C. § 151 *et seq.*, Congress tasked the Federal Communications Commission (Commission or FCC) with adjudicating applications to transfer broadcast licenses. The Commission's statutory duty in processing such requests is straightforward: it "shall grant" an application if the proposed transfer will serve "the public interest, convenience, and necessity." *Id.* § 309(a); see *id.* § 310(d).

But the Commission abdicated that duty here by withholding approval of a multibillion-dollar broadcast deal that will yield substantial public-interest benefits. Appellants SGCI Holdings III LLC (Standard General), TEGNA Inc., and CMG Media Corporation (together, the broadcasters) negotiated an $8.6 billion transaction that would create the largest-ever minority-owned and female-led television station group in the Nation. That deal will not only expand opportunities for minority and female journalists and media professionals, but it will also enhance broadcast competition by reducing market concentration and substantially increase much-needed investments in local news nationwide. To effectuate that transaction, the broadcasters applied to the FCC to transfer station licenses. These applications require no waivers, fully comply with FCC

1

rules, and markedly improve diversity in media ownership. Accordingly, approval should have come as a matter of course.

The Commission, however, has chosen to kill that transformative transaction. And it has done so without a word of explanation. Instead, the FCC elected to allow a subordinate component—its Media Bureau—to set the matter on a protracted and unlawful procedural path that the FCC knows cannot be completed before the deal dies of natural causes. As the Commission has known since the broadcasters first applied for the license transfers more than a year ago (on March 10, 2022), the deal must be completed by May 22, 2023. On that date, critical and now-irreplaceable financing commitments will expire.

Yet on February 24, 2023, after permitting unprecedented pleadings and discovery and failing to reach a decision after 11 months, the FCC's Media Bureau abruptly ordered the matter set for a "hearing" before the FCC's Administrative Law Judge (ALJ)—in essence, a full-blown trial. Appellants' Appendix (App.) 938-968 (Hearing Order). It is common ground that such a "hearing" cannot be completed before the transaction's long-known, immovable deadline. In the past 30 years, the shortest such hearing lasted nearly a year. Setting the matter for hearing in

these circumstances is no different than disapproving the applications outright. But despite the broadcasters' urgent entreaties, the Commission declined to countermand the Bureau's Hearing Order, refusing even to respond.

By allowing the Media Bureau's directive to stand, the Commission has embraced that unlawful action as its own. And because (absent this Court's intervention) the Hearing Order will necessarily mean the deal's demise and leave no occasion for future consideration by the Commission, that action constitutes the agency's final, definitive word. That final action is unlawful for at least three independent reasons.

First, the adjudicator assigned to oversee the hearing and render an initial decision on the assigned issues cannot constitutionally do so. The Commission's ALJ is unlawfully insulated from presidential oversight by three layers of for-cause removal restrictions. Two layers are fatal under Supreme Court precedent. *Three* layers are beyond defense.

Second, the Commission lacks statutory authority to decide the issues that the hearing called for by the Media Bureau would address. The Commission itself has repeatedly recognized this lack of authority.

Finally, even if the legal issues were within the FCC's authority, no hearing would be warranted because the parties opposing the transaction have not substantiated any questions of material fact that could warrant a trial.  And Standard General's voluntary, binding commitments eliminate any uncertainty.

Reversal of the Commission's decision is required under these circumstances.  No reasonable adjudicator could find that the applications are inconsistent with the public interest.  Given the urgent timeline and the Commission's demonstrated propensity for delay, an open-ended remand for further proceedings would simply prolong this $8.6 billion deal's unjustified uncertainty.  Because granting the applications is indisputably consistent with the public interest, the Court should instruct the Commission to grant the applications.

## JURISDICTIONAL STATEMENT

Under the Communications Act, this Court has exclusive jurisdiction to hear "[a]ppeals" from "decisions and orders of the Commission" that are brought by "any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization * * * whose application is denied by the Commission," or any party "whose interests

4

are adversely affected" by such denial.  47 U.S.C. § 402(b)(3), (6).  The

appeal must be brought within thirty days of when "public notice is given

of the decision or order."  *Id.* § 402(c).

As explained in further detail below, see Part I, *infra*, the Hearing

Order constitutes a final denial of the broadcasters' applications for au-

thorization to transfer station licenses because the order has the appar-

ent purpose and inarguable effect of running out the clock on the financ-

ing underpinning the transaction—killing the transaction and obviating

the transfer applications.  The broadcasters are parties to the transfer

applications, App. 138, 145, and have been "adversely affected" by the

effective denial because it prohibits them from consummating the trans-

action.  47 U.S.C. § 402(b)(3), (6).  The appeal was timely filed on March

27, 2023, which is within 30 days of the Hearing Order's February 24,

2023 release date.  See *id.* § 402(c); 47 C.F.R. § 1.4(e), (j) (when filing date

falls on weekend, deadline is the next business day); Fed. R. App. P.

26(a)(1)(C) (same); *PSSI Global Services, LLC* v. *FCC*, 983 F.3d 1, 6 (D.C.

Cir. 2020) (applying FCC regulation keying "public notice" to release

date).

## STATEMENT OF ISSUES

1.    Whether the Hearing Order, which sent the applications to a hearing that the Commission knew could not be concluded in time to complete the transaction, effectively denied the applications and therefore constitutes final agency action reviewable on direct appeal.

2.    Whether the Hearing Order violates Article II of the Constitution and *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), by setting a hearing before an ALJ, who is an inferior officer insulated from presidential oversight by three layers of for-cause removal protections.

3.    Whether the Hearing Order is contrary to law, in excess of the Commission's authority, and arbitrary and capricious because it effectively denies the applications based on concerns about retransmission fees and nondiscriminatory employment practices that the Commission lacks statutory authority to consider.

4.    Whether the Hearing Order is contrary to law and arbitrary and capricious because it compels a hearing based solely on unsupported speculation that is contradicted by clear record evidence and thus denied

6

the applications without a legally sufficient evidentiary basis for doing so.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the separately bound Addendum.

## STATEMENT OF THE CASE

The mandamus petition filed concurrently with this appeal relates the factual and procedural history of this case in detail.  See Pet. at 7-18, *In re SGCI Holdings III LLC*, No. 23-1084.  An abbreviated version of that history follows.

A.    In February 2022, led by a team of experienced broadcast executives with a proven record of supporting local control of stations, Standard General agreed to acquire broadcast company TEGNA in an $8.6 billion transaction.  App. 6, 141, 612-614.  The transaction would create the largest minority-owned, female-led broadcast television company in U.S. history—owning 61 full-power television stations and two full-power radio stations.  App. 141, 147.  It would increase diversity in broadcasting, tripling the number of minority-owned TV stations in the

United States.  App. 373, 933.  And it would *reduce* concentration in broadcast ownership.  App. 592.

As a result of these benefits, more than 70 legislators and organizations spanning many sectors—civil rights, labor, broadcasting, media, and business—supported the transaction in front of the FCC.  Standard General and TEGNA Facts, *Supporters*, bit.ly/3mI3Lyl (last visited Mar. 30, 2023).

B.    The broadcasters have worked diligently to secure regulatory approvals.  The Department of Justice declined to intervene during the pre-merger waiting period regarding antitrust matters.  See 15 U.S.C. § 18a(a), (b)(1).  And an inter-Cabinet telecommunications review panel, informally known as Team Telecom, raised no objections to the deal on the basis of foreign ownership and national security concerns.  App. 817. The only remaining step is for the Commission to approve transferring the broadcast licenses.

The broadcasters moved promptly to file their comprehensive license-transfer applications on March 10, 2022, just two weeks after the transaction was announced.  See 47 U.S.C. § 310(d); App. 138.  The applications and accompanying documents made clear that the final

8

deadline for closing the transaction—after the broadcasters exhausted all possible extensions—is May 22, 2023.  App. 95.  After that date, the financing commitments needed to close the transaction will expire, and the deal will die.

Although the financing commitments could not have been extended indefinitely, the 14 months that the broadcasters gave the Commission should have been more than enough time to process the applications.  For decades, the Commission has publicly committed to trying to adjudicate all license-transfer applications within *180 days*.  See FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex Mergers*, bit.ly/3FcxUMe (last visited Mar. 30, 2023).  The Commission has approved license transfers for comparable recent transactions in 62 to 185 days.  See *Meredith Corp.*, 36 FCC Rcd 15870, 15870 (Nov. 12, 2021) (185 days); compare *id.* at 15877 n.67, with *Quincy Media*, 36 FCC Rcd 5544, 5544 (Mar. 12, 2021) (168 days); PR Newswire, *Scripps Prices Senior Notes Offering*, bit.ly/3M0pETT (Dec. 15, 2020) (62 days); App. 1038 (chart comparing these timelines).

The Commission's review of this particular transaction should have been especially straightforward. Unlike other recent deals, the transaction requires no regulatory waivers or divestitures and complies fully with national and local ownership limits. App. 591. The Commission's 180-day target should have been easy to meet. *A fortiori*, the 14 months that the broadcasters afforded was more than ample time.

If, however, the transaction cannot close in 14 months, the broadcasters have no way to resuscitate the deal. The financing they obtained in early 2022 cannot be replicated given today's higher interest rates and weaker economic outlook. Moreover, if Standard General cannot close the transactions, it will face a $136 million termination fee. App. 21, 98-99. But that eventuality should never come to pass.

C. 1. The broadcasters' applications initiated the Commission's regular review process. The Commission must grant applications to transfer a station license if it finds that the transfer will serve "the public interest, convenience, and necessity." 47 U.S.C. § 309(a); see *id.* § 310(d).

The public may comment on, and third parties may petition to deny, the license-transfer applications. 47 U.S.C. § 309(d). A petition to deny

must contain "specific allegations of fact" supported by affidavits based on personal knowledge (or subject to official notice) to show that granting the application would be "prima facie inconsistent" with the public interest. *Id.* § 309(d)(1). If the Commission finds "that there are no substantial and material questions of fact and that a grant of the application would be consistent with" the public interest, it must grant the application. *Id.* § 309(d)(2). The statute directs the Commission to designate the matter for a hearing only if a "substantial and material question of fact" is shown or the Commission is otherwise "unable to find" that the transfer is in the public interest. *Ibid.*; see *id.* § 309(e).

Upon receiving the broadcasters' applications, the Commission's Media Bureau (acting on delegated authority, see 47 C.F.R. § 0.61(a)) took six weeks to announce that the applications were complete, accept them for filing, invite public comments, and set out a pleading cycle for petitions to deny. App. 312. The process was thus unusually extended from the start.

2.    Two sets of challengers filed petitions to deny the applications, primarily advancing the same two arguments. First, they contended that the transaction is structured to increase retransmission fees

by using after-acquired clauses in distributor contracts to raise rates based on the rates charged by one of the stations Standard General is acquiring.  App. 407-409; 497-501.  Second, they argued that Standard General intended to lay off newsroom staff at the stations it was acquiring to the detriment of local news coverage.  App. 405-407; 496-497.  Several multichannel video-programming distributors and affiliated trade groups also commented, asking the Commission to impose economic conditions favorable to their interests—but not opposing the deal.  App. 549-584.

The Media Bureau made no pretense of adhering to the Commission's general six-month commitment to resolve license-transfer matters. See FCC, *Informal Timeline*, *supra*.  Rather, the Bureau has held up the transaction for more than a year through atypical extensions of the pleading schedule, an unprecedented *three* rounds of comments spread over eight months (in place of the standard single round), and extensive discovery, again in multiple rounds spread over months.  App. 314, 324-339, 348, 351-356, 663, 716-723, 729, 838.  That uncommonly protracted process has resulted in a comprehensive record that is fully developed and dispels the challengers' speculative claims that the transaction will lead

12

to increased retransmission fees, or to reductions in staff and local pro-gramming in newsrooms. *E.g.*, App. 370-384, 730-753.

On top of that record, Standard General eliminated any possible lingering concerns regarding the two principal issues the challengers had raised through a pair of binding commitments. First, Standard General irrevocably waived its right to enforce any after-acquired clauses that, by reason of the transaction, could have increased retransmission fees for the TEGNA stations. App. 831. Second, it pledged not to conduct any journalism or newsroom staffing layoffs or similar reductions at the sta-tions for at least two years. App. 832-833. In fact, it plans to invest in expanded news coverage and increase station-level staffing. *Ibid.* It lim-ited its commitment to two years solely to preserve its ability to respond to changing economic circumstances many years into the future. *Ibid.*

D.     Despite the extensive record, the exhaustive proceedings, and Standard General's binding commitments, the Media Bureau—more than 11 months into the proceedings, and with just 88 days before the essential financing for the transaction was set to expire—ordered still *more* administrative process. On February 24, it issued the Hearing

Order, designating the broadcasters' applications for a hearing before the Commission's ALJ.  App. 938-968.

The Hearing Order spells demise for the deal, as the challengers, the market, the media, and the Commission's own Enforcement Bureau acknowledge.  App. 1034; Jon Schleuss, *Thank FCC Chair Rosenworcel for Saving Local News*, Newsweek (Mar. 17, 2023), bit.ly/3JDFktH; Sabela Ojea, *Tegna Shares Plunge 25% as FCC Seeks Hearing on Standard General Deal*, Dow Jones Newswires (Feb. 24, 2023), bit.ly/3lIYm9P.  The fastest license-transfer hearing in the past three decades took almost a year; the average takes more than two years.  See *Hicks Broadcasting of Indiana*, 13 FCC Rcd 10662 (1998) (358 days); *Petroleum V. Nasby Corp.*, 8 FCC Rcd 4035 (1993) (493 days); *Voice in the Wilderness*, 17 FCC Rcd 17061 (2002) (512 days); *Patrick Sullivan*, 29 FCC Rcd 5421 (2014) (1,834 days).

The Hearing Order makes no attempt to expedite the process.  It allows 35 days to run (nearly 40% of the time left to close the transactions) just for the parties to enter appearances and for the ALJ to enter a scheduling order.  App. 959-960.  Consistent with the agency's refusal to recognize the time-sensitive nature of the situation, the ALJ waited 33

days and then failed even to comply with the Hearing Order. Instead of setting a schedule with a "set date for resolution," App. 960, she gave the parties three weeks to set a schedule and set an initial status conference for April 26—less than a month before the transaction's expiration, Initial Case Order, MB Docket No. 22-162, FCC 23M-08 (Mar. 29, 2023).

The Hearing Order concluded that there were substantial questions regarding whether granting the applications was in the public interest, and it ordered the ALJ to examine the two issues raised by the challengers: (1) whether the transaction's "structur[e] * * * is likely to trigger a rate increase harmful to consumers, as a result of" after-acquired clauses, and (2) whether the transaction "will reduce or impair localism, including whether [it] will result in labor reductions at local stations." App. 939. But the Hearing Order did not identify any facts supported by affidavits based on personal knowledge or subject to official notice. Instead, the order cited the challengers' own allegations, which, in turn, relied on magazine articles and the challengers' reading of the record. App. 947-948 (citing App. 408-410, 498-500, 549-552, 563, 754-755, 861), 952-953 (citing App. 407, 725-727, 764-768, 770-772).

E.    Because the Hearing Order effectively denies the applications, the broadcasters quickly exhausted every administrative remedy available to them before the Commission.  They explained to the ALJ and the full Commission that the Hearing Order was unlawful.  App. 969-994. The ALJ refused to certify the Hearing Order to the Commission for immediate review.  App. 1039-1042.

The broadcasters immediately filed an application for review of the Hearing Order with the Commission, raising similar arguments.  App. 1054-1090.  They requested that the FCC waive its general prohibition on interlocutory review in 47 C.F.R. § 1.115(e) and alternatively urged it to take up the applications sua sponte under 47 C.F.R. § 1.117.  App. 1043-1044.  They informed the FCC that, if the agency did not act by 5 p.m. on March 27—the statutory deadline for seeking direct review of the Hearing Order, see 47 U.S.C. § 402(c)—they would seek judicial review.  App. 1044.  The Commission did not act by that time, and the broadcasters accordingly commenced this appeal of the Hearing Order.

In the event this Court determines that the Hearing Order is not a final agency action, the broadcasters have also concurrently filed a conditional petition for writ of mandamus, seeking to compel the FCC to

16

render a formal, final decision on the applications.  See *In re SGCI Holdings III LLC*, No. 23-1084.  To ensure that both the appeal and mandamus petition can be resolved efficiently and in time for the transaction to close, the broadcasters have filed an emergency motion to expedite consideration of both the appeal and the mandamus petition and to consolidate the two actions.

## SUMMARY OF ARGUMENT

I.    The Hearing Order is a final denial of the applications reviewable on direct appeal.  See 47 U.S.C. § 402(b).  The Supreme Court and this Court have "long taken" a "'pragmatic' approach  * * *  to finality" that asks whether the agency, "for all practical purposes 'has ruled definitively'" on a question.  *U.S. Army Corps of Engineers* v. *Hawkes Co., Inc.*, 578 U.S. 590, 598-599 (2016) (citations omitted); see *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997); *Friedman* v. *FAA*, 841 F.3d 537, 541-543 (D.C. Cir. 2016).  The Commission has ruled on the broadcasters' applications by tacitly approving a procedure that it knows will kill the deal.

The FCC's actions show that it has made up its mind not to approve the license transfers.  As the Commission's own enforcement staff have acknowledged, an ALJ hearing could not result in a decision on the

17

applications before the deal's deadline. The broadcasters flagged that deadline for the Commission in the proposed agreement more than a year ago. And "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Environmental Defense Fund, Inc.* v. *Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970).

II.    The Hearing Order is unlawful.

A.    The Hearing Order instructs the Commission's ALJ to preside over the hearing and resolve two issues. But the ALJ cannot constitutionally do so. The ALJ is insulated from the President's control by three layers of for-cause removal protection—sequestering the ALJ to an even greater extent than the two-layer scheme the Supreme Court invalidated in *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477, 483-484 (2010). The Fifth Circuit recently held unconstitutional an essentially indistinguishable scheme of three layers of removal protections afforded to SEC ALJs. *Jarkesy* v. *SEC*, 34 F.4th 446, 463-464 (5th Cir. 2022), petition for cert. pending, No. 22-859 (filed Mar. 8, 2023). For the same reasons, the Hearing Order is unlawful.

18

B.     The Hearing Order also impermissibly rests on findings about two issues that lie beyond the FCC's statutory authority:  supposedly increased  retransmission  fees  and  decreased  station-level  employment.  The agency's charge to assess whether a license transfer will advance the public interest is limited to facets of the public interest that align with the purposes of the Communications Act.  Neither of the Hearing Order's bases tracks the aims of the Act, as the Commission has long acknowledged.

C.     Finally,  even  if  the  Commission  had  authority  to  consider whether retransmission fees would increase or staffing levels would decrease following the transaction, the Hearing Order is arbitrary and capricious because it is not supported by the type of evidence the law requires.  No hearing is warranted absent facts supported by affidavit on personal knowledge (or subject to official notice).  But the Hearing Order cites only the challengers' allegations, which, in turn, cite magazine articles and the challengers' reading of the record.  No competent evidence casts doubt on the applications' consistency with the public interest.  And Standard General's irrevocable commitments not to increase transmission fees and not to decrease staffing resolved any lingering concerns.

III.   The proper remedy is to reverse the Hearing Order and re-
mand to the FCC with instructions to grant the applications.  Because it
is clear that there is no substantial question of material fact, the Com-
mission must "make the grant" of the applications.  47 U.S.C. § 309(d)(2).
Simply setting aside the Commission's decision and returning the matter
to the agency without more would only afford yet another opportunity for
the Commission to run out the clock on the broadcasters' applications and
complete its unlawful pocket veto.  At a bare minimum, any remand must
direct the Commission to act in accord with its constitutional and statu-
tory obligations and to resolve the matter in time for the broadcasters to
pursue any necessary judicial relief before May 22.

## STANDING

Article III requires (1) an injury-in-fact, (2) caused by the defend-
ant, (3) that is likely to be redressed by a favorable decision.  *TransUnion
LLC* v. *Ramirez*, 141 S. Ct. 2190, 2203 (2021).  In analyzing standing, the
Court assumes the plaintiff's theory of the case.  *Attias* v. *Carefirst, Inc.*,
865 F.3d 620, 629 (D.C. Cir. 2017).  The broadcasters have standing to
challenge the Commission's order effectively denying their applications
because that denial deprives them of the economic benefits of the

20

transaction and exposes Standard General to a $136 million termination fee. App. 21, 98-99. If the Court reverses the Hearing Order, the broadcasters could close the transactions, and their injury would be redressed.

## STANDARD OF REVIEW

Appeals from FCC licensing determinations are examined under the familiar standards prescribed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, 701 *et seq. Schoenbohm* v. *FCC*, 204 F.3d 243, 246 (D.C. Cir. 2000). Courts must set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations" or is "arbitrary," "capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A), (C). These standards require courts to "guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority." *Planned Parenthood Federation of America, Inc.* v. *Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983).

Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Manufacturers Ass'n of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Agencies are "free to change their existing policies," but they must "provide a reasoned

explanation for [a] change." *Physicians for Social Responsibility* v. *Wheeler*, 956 F.3d 634, 646 (D.C. Cir. 2020) (citation omitted).

## ARGUMENT

Upon receiving a license-transfer application, the Commission "shall determine  * * *  whether the public interest, convenience, and necessity will be served by the granting of such application"—and, if so, the Commission "shall grant such application."  47 U.S.C. § 309(a); see *id.* § 310(d).  If the Commission receives a petition to deny the application, it nonetheless "shall make the grant" of the application and "deny the petition" if the petition raises "no substantial and material questions of fact" and "a grant of the application would be consistent with" the "public interest."  *Id.* § 309(d)(2).

After a prolonged and comprehensive discovery and comment process, and in full view of the impending May 22, 2023, expiration date for the transaction's financing, the Media Bureau announced that there were substantial questions regarding the applications' effect on the public interest and shunted the applications to an unconstitutional hearing that concededly cannot be completed in time for the deal to close.  In all but

22

name, that was a final denial of the applications that is reviewable—and reversible—by this Court.

The FCC's constructive denial was legally erroneous three times over: it (1) ordered an unconstitutional hearing, (2) cited concerns beyond the FCC's statutory authority as grounds for denial, and (3) supported those grounds with legally incompetent evidence. In reality, the record and law here support only one conclusion: there is no substantial question that granting the applications would further the public interest. This Court should reverse and remand with instructions to "make the grant" of the applications. 47 U.S.C. § 309(d)(2).

## I. The Commission Has Effectively Issued A Final Denial Of The Transfer Applications

This Court may hear appeals from "decisions and orders of the Commission" from "any party to an application for authority to transfer" a license that is "denied by the Commission," or a party "adversely affected" by such denial. 47 U.S.C. § 402(b)(3), (6). The broadcasters qualify. See p. 5, *supra*. By consigning the applications to a hearing that the Commission knew would outlast the viability of the transaction, the Commission has effectively issued a final denial warranting this Court's review.

A.    Agency action is final if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) determines "rights or obligations" or causes "legal consequences [to] flow." *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997) (citations omitted).  That inquiry is insusceptible of "self-implementing, bright-line rule[s]." *National Ass'n of Home Builders* v. *U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279 (D.C. Cir. 2005).  Instead, the "finality" rubric that the Supreme Court has "long taken" is thoroughly "pragmatic." *U.S. Army Corps of Engineers* v. *Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016).  The Supreme Court has insisted that "the consequences of deferment of judicial review" should guide finality—as they do under the "intensely 'practical' approach which the [Supreme] Court has adopted" regarding appeals from final district-court judgments under 28 U.S.C. § 1291.  *Mathews* v. *Eldridge*, 424 U.S. 319, 331 n.11 (1976) (citing *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949)).

Under that pragmatic approach, the ultimate question is whether the agency, "for all practical purposes[,] 'has ruled definitively'" on the disputed issue.  *Hawkes*, 578 U.S. at 598 (citation omitted).  It is well established in this Circuit that agency action may be final in that sense

24

even in "the absence of a formal statement," for "agency inaction may represent effectively final agency action that the agency has not frankly acknowledged." *Her Majesty the Queen in Right of Ontario* v. *EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (letter indefinitely postponing petition for rulemaking was final agency action) (citation omitted). That is particularly true where "exigent circumstances render" an agency's "failure to act  * * *  equivalent to a final denial" of action and threaten "irreparable injury," and "administrative inaction has precisely the same impact on the rights of the parties as denial of relief." *Environmental Defense Fund, Inc.* v. *Hardin*, 428 F.2d 1093, 1098-1099 (D.C. Cir. 1970) (failure to rule on petition to suspend registration was final agency action because it was "tantamount to an order denying suspension"). The test for finality "is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case." *Clean Air Council* v. *Pruitt*, 862 F.3d 1, 7 (D.C. Cir. 2017) (citation omitted) (order staying final rule constituted final agency action).

This Court recently reaffirmed these principles in *Friedman* v. *FAA*, 841 F.3d 537 (D.C. Cir. 2016). There, the FAA advised an

25

applicant for a pilot certification that his application "remain[ed] under consideration"—even though the agency had already explained that the application could not go forward without certain medical information that the applicant refused to provide. *Id.* at 540-541 (citation omitted). The Court held that there had been "a constructive denial" of the application that constituted final agency action because those "actions suggest [the agency] ha[d] made up its mind," even though further administrative proceedings were theoretically available. *Id.* at 541, 543.

The *Friedman* Court held that "the applicable test" for finality "is not whether there are further administrative proceedings available, but rather 'whether the impact of the order is sufficiently "final" to warrant review in the context of the particular case.'" 841 F.3d at 542 (citation omitted). The FAA could not "preven[t] [the challenger] from obtaining any explicitly final determination on his application [while] thwarting the Court's interest in reviewing those agency actions that, in practical effect if not formal acknowledgement, constitute" final agency action. *Ibid.* The Court explained that the agency's "actions suggest[ed]" that it "ha[d] made up its mind, yet it s[ought] to avoid judicial review by holding out a vague prospect of reconsideration." *Id.* at 543.

26

B.    Under these principles, the Hearing Order is final.

1.    The Hearing Order is the consummation of the Commission's decisionmaking—the agency's "actions suggest [it] has made up its mind" that the applications should be denied. *Friedman*, 842 at 543. The Media Bureau ordered a hearing with full awareness that the financing essential to the transaction would expire in 88 days, and that no such hearing in the Commission over the past 30 years has *ever* concluded in fewer than 300 days. *See* p. 14, *supra*. Indeed, the Commission's Enforcement Bureau *conceded* that it would be "impossible" to complete the hearing in the time remaining for the transaction to close. App. 1034.

That fatal postponement tracks the agency's pattern of delays throughout the proceeding—including delay in accepting the applications for filing and setting the initial pleading cycle dates, multiple extensions on pleading deadlines, an unprecedented three separate comment periods, and a months-long lag in considering and ultimately granting many of the challengers' far-reaching discovery requests. As this Court has recognized for more than half a century, "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision

27

in the form of inaction rather than in the form of an order denying relief." *Environmental Defense Fund*, 428 F.2d at 1099.

Indeed, the ALJ hearing can serve no purpose *other* than delay. The Hearing Order did not identify any gap in the factual record that needs filling. Nor could it have, given the broadcasters' comprehensive document production. Instead, the Hearing Order described legal conclusions to be drawn based on the evidence—hardly the sort of task that requires a hearing. See *Barrick Goldstrike Mines Inc.* v. *Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (finding final action where court could not "imagine [anything] happening [that] would bring the issues into greater focus").

Moreover, in the pragmatic sense that controls the finality analysis, the Commission "has rendered its last word on the matter." *Whitman* v. *American Trucking Ass'ns, Inc.,* 531 U.S. 457, 478 (2001) (citation omitted). No further proceedings will occur before the agency because the transaction will be dead long before any ALJ hearing is completed. Indeed, to this day the FCC continues to slow roll the applications. The Hearing Order gave the ALJ 35 days to set a schedule with a "set date for resolution." App. 960. Yesterday—on the 33rd day after the Hearing Order issued—the ALJ ordered the parties to propose a schedule in three

28

weeks and set an initial status conference for April 26. Initial Case Order, *supra*. Although there may notionally be "further administrative proceedings available," the "impact of the order is sufficiently final to warrant [judicial] review" now—lest the denial escape judicial review entirely. *Clean Air Council*, 862 F.3d at 7; see *American Trucking*, 531 U.S. at 479 ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior * * * belies the claim that its interpretation is not final"); see *Friedman*, 841 F.3d at 542.

2.    The Commission's constructive denial of the applications also settles the broadcasters' transmission rights definitively. Standard General may not acquire stations that broadcast over the airways unless the applications to transfer the licenses are approved. See *National Ass'n of Home Builders*, 417 F.3d at 1279 (permit decisions "carry easily-identifiable legal consequences"); *Friedman*, 841 F.3d at 543 (second *Bennett* prong satisfied where pilot certification applicant could not resume employment as pilot).

That the Commission denied the applications through strategic delay instead of a formal denial does not make its decision less final. The

irreparable harm of the Commission's delay—*i.e.*, the demise of the trans-action absent intervention from this Court—"has precisely the same im-pact on the rights of the parties as denial of relief." *Environmental Defense Fund*, 428 F.2d at 1099. In other words, the "practical effect" of the Hearing Order constituted a "constructive denial" of the applications. *Friedman*, 841 F.3d at 541-542. Allowing that denial to escape judicial scrutiny would create a playbook for future agency pocket vetoes. *Id.* at 542 (agency may not "thwart[] the Court's interest in reviewing" its de-cisions simply by withholding "formal acknowledgement" of the decision).

Nor does the Commission's failure to pass formally on the broad-casters' application for review doom judicial scrutiny. Again, assessing finality pragmatically with an eye towards preserving judicial review, the Commission's conspicuous "inaction" in the face of exigent circumstances suggests that it has "made up its mind." *Friedman*, 841 F.3d at 543 (ci-tation omitted). The broadcasters sought Commission intervention the day after the ALJ denied their motion to certify the outstanding issues to the Commission, exhausting their last remaining avenue for relief within the agency. 47 U.S.C. § 155(c)(7) ("filing of an application for review" re-quired for judicial review); 47 C.F.R. § 1.115(k) (same). That filing

requested that the Commission either waive the ALJ-certification requirement or invoke its authority to review such actions sua sponte. App. 1043-1044. Because no other avenues remained to secure Commission-level relief, the broadcasters informed the Commission that, in light of the urgent timeline, they intended to bring the matter to this Court on March 27, 2023, if the FCC did not act by that date. App. 1044.

The Commission did not act on that request. Even now, it has not responded. Continuing to await word from the Commission would simply invite further delay and reward the Commission's evasive tactics.

## II.    The Commission's Effective Denial Of The Applications Is Unlawful

The Hearing Order declined to grant the applications—and instead ordered an ALJ hearing on the challengers' petitions to deny—because of supposedly substantial and material questions of fact regarding the applications' effect on the public interest. 47 U.S.C. § 309(d)(2). The only factual issues the Media Bureau identified in the Hearing Order are whether the transaction will (1) increase retransmission fees or (2) decrease newsroom staffing. But the Bureau's order setting the matter for an ALJ hearing on those issues—and thus constructively denying the applications, which as all recognize will become moot long before the

31

hearing could conclude—is unconstitutional, in excess of the Commission's statutory authority, contrary to law, and arbitrary and capricious. See 5 U.S.C. § 706.

The agency's effective denial of the applications in the Hearing Order is unconstitutional because it withholds approval pending a proceeding before a federal officer who cannot constitutionally preside or render any initial or recommended ruling. The ALJ is an inferior officer of the United States but is impermissibly insulated from presidential supervision by three levels of "for cause" removal protection.

The Hearing Order's grounds for the denial are independently unlawful. The Commission lacks statutory authority to withhold approval based on an application's effect on retransmission fees or possible employment ramifications in assessing the public interest. And even if those issues were lawfully within the Commission's ken, the denial still was contrary to law, and arbitrary and capricious, because the Hearing Order was not supported by any competent evidence. Indeed, the record lacks any evidence sufficient to warrant further factual inquiry.

32

## A.  The Denial Is Unlawful Because It Orders An Unconstitutional Hearing

As an initial matter, the Constitution prohibits the Commission from implementing its denial by ordering a hearing conducted by an Executive officer who is impermissibly insulated from presidential control. See 5 U.S.C. § 706(2)(A), (B) (prohibiting agency action "not in accordance with law" and "contrary to constitutional  * * *  power"); *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (the APA "provides for setting aside agency action that is 'unlawful,' which of course includes unconstitutional action" (citation omitted)).

Article II of the Constitution "vests '[t]he executive Power  * * *  in a President of the United States of America,' who must 'take Care that the Laws be faithfully executed.'"  *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477, 483 (2010) (quoting U.S. Const. Art. II, § 1, Cl. 1, § 3).  An indispensable facet of the President's duty is supervising and controlling the actions of subordinate Executive officers who "wield executive power on his behalf."  *Seila Law LLC* v. *CFPB*, 140 S. Ct. 2183, 2191 (2020).  "Since 1789, the Constitution has been understood to empower the President to keep these officers

33

accountable—by removing them from office, if necessary." *Free Enterprise Fund*, 561 U.S. at 498; see *Myers* v. *United States*, 272 U.S. 52, 117 (1926).

As the Supreme Court has made clear, "the Constitution's separation of powers" does not permit a statutory scheme imposing two layers of for-cause removal protection between the President and an inferior officer. *Free Enterprise Fund*, 561 U.S. at 498. While "one level of protected tenure" may be permissible, the second level "changes the nature of the President's review" because the President can no longer "oversee" the officer or "attribute the [officer's] failings to those whom he can oversee." *Free Enterprise Fund*, 561 U.S. at 495-496 (emphasis omitted). The second level therefore "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498.

*A fortiori*, the FCC's ALJ—an inferior officer shielded by *three* layers of for-cause removal restrictions—is impermissibly beyond the President's control. The ALJ is an inferior officer (not an employee) under the Supreme Court's decision in *Lucia* v. *SEC*, 138 S. Ct. 2044 (2018), which addressed closely analogous SEC ALJs. Like an SEC ALJ, the FCC's

34

ALJ holds a "continuing offic[e] established by law" and "exercise[s] significant discretion" in carrying out her "authority * * * to ensure fair and orderly adversarial hearings." *Id.* at 2052, 2054; see 5 U.S.C. §§ 556-557, 3105; 47 C.F.R. § 0.341.

The Commission's ALJ is also subject to three levels of for-cause removal restrictions:

- The Commission may remove the ALJ only if the Merit System Protection Board first makes a finding of good cause to do so. See 5 U.S.C. § 7521(a); 5 C.F.R. § 1201.137.

- Members of that Board, in turn, "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

- And the FCC Commissioners serve statutorily fixed terms, 47 U.S.C. § 154(c)(1), and thus under Supreme Court precedent are presumed to be removable only for cause, see *Free Enterprise Fund*, 561 U.S. at 487.

To remove an ALJ over the objection of incumbent subordinates, the President must therefore overcome three layers of for-cause removal protection. That scheme brings to life the Court's limiting-principle hypothetical in *Free Enterprise Fund*: "If Congress [could] shelter the bureaucracy behind two layers of good-cause tenure, why not a third?" 561 U.S. at 497. The three levels of protection insulating the ALJ violate

35

Article II by embedding her "within a Matryoshka doll of tenure protec-tions," wholly shielded from presidential oversight. *Ibid.*

The Fifth Circuit has recently held that a materially indistinguish-able triple-for-cause-removal regime for SEC ALJs is unconstitutional. *Jarkesy* v. *SEC*, 34 F.4th 446, 463-464 (5th Cir. 2022), petition for cert. pending, No. 22-859 (filed Mar. 8, 2023). Citing the Supreme Court's de-cisions in *Lucia* and *Free Enterprise Fund*, the Fifth Circuit reasoned that SEC ALJs are unconstitutionally insulated from presidential control because they (1) are inferior officers who exercise "sufficiently important" duties such as "controlling the presentation and admission of evidence," "punish[ing] contemptuous conduct," and rendering decisions that are of-ten "final and binding"; and (2) are protected by more than two layers of for-cause removal. *Ibid.* The same result should follow here—the FCC's ALJ exercises similar functions, 5 U.S.C. §§ 556-557, 3105; 47 C.F.R. § 0.341, and is subject to identical removal protections.

The government may argue—as it has with respect to SEC ALJs in its pending petition for certiorari in *Jarkesy*—that the FCC ALJ may con-stitutionally be protected by greater removal limitations than the officers *Free Enterprise Fund* addressed because FCC ALJs "perform adjudicative

functions rather than enforcement or policymaking functions." Pet. for Cert. at 18, *Jarkesy*, *supra* (No. 22-859) (citation omitted). But that distinction makes no difference. As an Executive officer, the FCC's ALJ exercises Executive power and none other, see *American Insurance Co.* v. *Canter*, 26 U.S. (1 Pet.) 511, 546 (1828) (Marshall, C.J.) (adjudicators are "incapable of receiving" judicial power unless they possess life tenure and salary protection); accord *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (C.C. Va. 1833) (Marshall, C.J.), and in turn "must be accountable to the President" and "subject to the President's control," *Fleming* v. *United States Department of Agriculture*, 987 F.3d 1093, 1116 (D.C. Cir. 2021) (Rao, J., concurring in part and dissenting in part).

Indeed, the government has previously acknowledged that whether an Executive officer performs adjudicative functions makes no difference to the constitutional question. In *Lucia*, the government argued that unless the Court adopted a (heroic) saving construction of the statute restricting removal of SEC ALJs, 5 U.S.C. § 7521, "the limitations that the provision imposes on removal of the Commission's ALJs would be unconstitutional." Gov't Br. at 53, *Lucia*, *supra* (No. 17-130). And just like the FCC ALJ, the SEC ALJs at issue in *Lucia* performed adjudicative

37

functions. Moreover, as the Fifth Circuit explained in *Jarkesy*, the government's saving-by-rewriting construction of Section 7521 in *Lucia*—which it urges again in *Jarkesy*—"would not solve the Article II problem" for officers like SEC and FCC ALJs because two other layers of for-cause removal restrictions would still remain. 34 F.4th at 465.

The broadcasters cannot lawfully be made to appear before an inferior officer whom the President is unconstitutionally prohibited from controlling. The Commission's decision to deny the applications by permitting the ALJ hearing to proceed is unlawful and must be reversed.

This case's posture does not implicate the remedial questions presented in cases like *Collins* v. *Yellen*, 141 S. Ct. 1761 (2021), where parties sought to "'void' the acts" of an unconstitutionally insulated government official retrospectively. *Cochran* v. *SEC*, 20 F.4th 194, 210 n.16 (5th Cir. 2021) (en banc), cert. granted, 142 S. Ct. 2707 (2022). Rather, the broadcasters seek relief solely on a *prospective* basis to safeguard their own structural constitutional right not be forced to appear before an officer who is presiding in violation of the Constitution. See *ibid.*

38

**B.    The Denial Is Unlawful Because It Rests Solely On Grounds That Exceed The Commission's Authority**

The Hearing Order is independently unlawful because the Commission lacks statutory authority to block a transaction on either of the grounds the hearing is slated to assess:  supposedly increased retransmission fees and decreased station-level employment.  As a result, both of the Media Bureau's reasons for effectively denying the broadcasters' applications are in excess of statutory authority, contrary to law, and arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C); see *Motor Vehicle Manufacturers Ass'n of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider").

The Communications Act charges the Commission with evaluating whether proposed licensed transfers will "serv[e]" the "public interest," 47 U.S.C. § 309(a); see *id.* § 310(d); it does not give the Commission its own "broad license to promote the general public welfare." *Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*, 595 F.2d 621, 628 (D.C. Cir. 1978) (en banc) (citation omitted).  Rather, Congress obligated the agency to pursue "the purposes of the regulatory legislation" in its

39

assessment of the public-interest standard. *Ibid.* (citation omitted). Neither increased retransmission fees (a matter of private contract) nor lower staffing levels (a matter of employment practices) are within the aim of the Communications Act.

1.    The Commission lacks statutory authority to block the transaction based on supposed concerns stemming from retransmission fees. In 1992, Congress amended the Act to create a retransmission-consent scheme to ensure "the ability of over-the-air broadcast television stations to compete for a viewing audience." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U.S. 622, 633 (1994). Television stations could elect to have programming distributors retransmit their content for free pursuant to "must-carry" provisions, see 47 U.S.C. § 534, or instead could negotiate with programming distributors to agree upon a retransmission fee that the distributors would pay them to air their content. To ensure a well-functioning market, Congress granted the FCC authority to adopt regulations requiring stations and distributors to negotiate retransmission consent agreements in good faith. 47 U.S.C. § 325(b)(3)(C).

Nevertheless, while Congress sought "to establish a marketplace for the disposition of the rights to retransmit broadcast signals," it never

40

intended for the FCC "to dictate the outcome of the ensuing marketplace negotiations."  S. Rep. No. 92, 102d Cong., 1st Sess. (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1169.  This understanding accords with the long-recognized purposes of the Communications Act, which "should not be turned into a mechanism" to "force the [FCC] to arbitrate contractual disputes."  *United Telephone Co. of Carolinas, Inc.* v. *FCC*, 559 F.2d 720, 723 (D.C. Cir. 1977).  The Commission therefore has no charge to prohibit an applicant from increasing retransmission consent fees pursuant to a fairly negotiated contract in the name of the "public interest."

Tellingly, the Commission *itself* has previously acknowledged its own lack of authority in this sphere.  Pursuant to established Commission policy, the Commission has consistently declined to block license transfers on the ground that they would increase retransmission consent fees.  See, *e.g.*, *Tribune Media Co.*, 2019 WL 4440126, at *10 (F.C.C. Sept. 16, 2019) (rejecting challengers' allegations that a proposed merger would harm the public interest by increasing retransmission consent fees); *Raycom Media, Inc.*, 2018 WL 6722650, at *6-7 (F.C.C. Dec. 20, 2018) (same).  As the Commission unambiguously explained in its *Tribune* decision, it does "not believe that an increase in retransmission

consent rates, by itself, is necessarily a public interest harm." 2019 WL 4440126, at *10.

The Hearing Order now suggests that the Commission has the authority to consider increased retransmission consent fees if there is "evidence of anticompetitive practices or other wrongdoing," and that *Tribune* held open the door for this interpretation. App. 947. But that is a red herring. The Hearing Order mentioned no evidence of any legally recognized anticompetitive practices or any other "wrongdoing" in this robust record—because there is none. In addition, the waiting period prescribed by the Hart-Scott-Rodino Act was allowed to expire. See 15 U.S.C. § 18a(a), (b)(1); p. 8, *supra*. The Commission may not embark on a fishing expedition searching for such evidence without first confirming that there are "specific allegations of fact" constituting a "prima facie" showing. 47 U.S.C. § 309(d)(2); *Citizens for Jazz on WRVR, Inc.* v. *FCC*, 775 F.2d 392, 397 (D.C. Cir. 1985) ("The statute in effect says that the Commission must look into the possible existence of a fire only when it is shown a good deal of smoke[.]").

Even if the Commission could validly reconsider its settled rejection of the view that "an increase in retransmission consent rates, by itself, is

42

necessarily a public interest harm," *Tribune*, 2019 WL 4440126, at \*5, it must "provide a reasoned explanation for the change," give fair notice, and account for reliance interests and other relevant considerations. *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221 (2016). The Hearing Order took no such steps here, and this failure alone renders it arbitrary and capricious. See *Fox Television Stations*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy *sub silentio*"). The Media Bureau, which issued the Hearing Order, could not do so on the Commission's behalf: the Bureau lacks authority to address "novel questions of law, fact or policy," and here there are no "existing precedents or guidelines" for it to apply—other than those rejecting the Media Bureau's position. 47 C.F.R. § 0.283(c).

In any event, the Commission should have had no occasion to consider increased retransmission fees in the first place because that issue is irrelevant to the transaction at issue. Standard General irrevocably waived its right to benefit from application of after-acquired clauses to the TEGNA stations it will control, meaning it cannot use them to increase retransmission fees. App. 831.

2.    The Media Bureau's only other basis for designating the applications for hearing—the station-level employment issue—likewise exceeds the scope of the Communications Act, and is an unlawful issue to be designated for a hearing.

This Court has recognized narrow limits on the Commission's ability to address employment matters in evaluating the public interest.  The Commission may "analyz[e] the employment practices of its licensees only to the extent those practices affect the obligation of the licensee to provide programming that fairly reflects the tastes and the viewpoints of minority groups, and to the extent those practices raise questions about the character qualifications of the licensee."  *Bilingual Bicultural*, 595 F.2d at 628 (citation omitted); see *National Organization For Women, New York City Chapter* v. *FCC*, 555 F.2d 1002, 1017-1018 (D.C. Cir. 1977).  There is no suggestion that such concerns are at issue here.

It speaks volumes that the statute gives the Commission no express authority to regulate employment as a general matter.  The FCC has no expertise on general issues of employment law.  If Congress intended to empower a communications agency to regulate employment matters unrelated to its area of expertise, it would have done so clearly.  See *National*

44

*Federation of Independent Business* v. *Department of Labor*, 142 S. Ct. 661, 665-666 (2022); *Alabama Ass'n of Realtors* v. *Department of Health & Human Services*, 141 S. Ct. 2485, 2488-2089 (2021).  But it did not. The Commission, as it has long recognized, has no such authority.

The Commission has consistently *refused* to investigate nondiscriminatory staffing decisions when deciding whether a license transfer is in the public interest.  See, *e.g.*, *Univision Holdings*, 7 FCC Rcd 6672, 6683 n.45 (1992); see also *Tribune*, 2019 WL 4440126, at *11 n.138.  Consistent with its straightforward statutory charge, the Commission has "never suggested that a reduction in a station's staff is contrary to the public interest, if conducted in a nondiscriminatory manner." *Univision Holdings*, 7 FCC Rcd at 6683 n.45.  It maintained this position even when reviewing mergers that—unlike the transactions at issue here—created new "duopoly" markets and a high likelihood that redundant station positions would be eliminated.  *Tribune*, 2019 WL 4440126, at *11 n.138.

To the extent the Commission wishes to change this position, it must state its reasons for doing so, provide fair notice, and account for the parties' reliance on the existing policy.  *Fox Television Stations*, 556 U.S. at 515.  Again, it failed to do so here.  And its Media Bureau could

45

not do so on the Commission's behalf under its existing regulations. See 47 C.F.R. § 0.283(c).

Even if the FCC could lawfully investigate nondiscriminatory employment practices, the applications here offer no chance to do so. Like retransmission fees, employment concerns are irrelevant to the applications because Standard General committed not to conduct any journalism or newsroom layoffs or similar reductions at the stations for at least two years. App. 832-833. It even offered to file reports with the Commission to verify its adherence to this commitment. Indeed, Standard General does not plan any station staffing reductions at all; the two-year sunset on its commitment merely preserves its ability to respond prudently to unforeseeable economic conditions that might arise in the future.

*****

Neither of the Commission's reasons for denying the applications is an appropriate "public interest" consideration. That the Commission itself has long recognized this fact only underscores this point—the "want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually

46

conferred." *West Virginia* v. *EPA*, 142 S. Ct 2587, 2610 (2022) (quoting

*FTC* v. *Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)).

## C.     The Denial Is Unlawful Because It Was Supported By No Competent Evidence

Finally, even if the Commission had authority to consider supposed

increases in retransmission consent fees and non-discriminatory employ-

ment issues, the effective denial on these grounds was supported exclu-

sively by evidence that the statute deems categorically insufficient.  No

competent record evidence raises a substantial question of fact, so no ra-

tional decisionmaker could have ordered a hearing instead of granting

the license applications.  In fact, Standard General has made binding

commitments to eliminate any lingering concerns.  Thus, the decision to

designate the applications for a hearing is both contrary to law and "so

irrational as to be arbitrary or capricious." *Citizens for Jazz*, 775 F.2d at

396.

A petition to deny justifies a hearing only if it sets forth "specific

allegations of fact" showing that granting the application "would be

prima facie inconsistent with" the public interest.  47 U.S.C. § 309(d)(1).

Those allegations must either be "supported by affidavit" by witnesses

with "personal knowledge," or concern a proper subject of "official notice."

*Ibid.* And the challengers' allegations and any supporting evidence still do not warrant a hearing unless they establish a "substantial" question of "material" fact. *Id.* § 309(d)(2); see *Citizens for Jazz*, 775 F.2d at 394-395. If a petition to deny contains only "ultimate, conclusionary" facts or makes "general allegations on information and belief, supported by general affidavits," then no hearing is justified. *Stone* v. *FCC*, 466 F.2d 316, 328 (D.C. Cir. 1972) (citation omitted). Because the petitions to deny the broadcasters' applications were not supported by competent evidence, the Media Bureau had no basis to order a hearing.

1.     Notwithstanding the statute's unambiguous command, the Hearing Order determined that there were substantial questions with respect to the applications' impact on the public interest by citing only sources other than affidavits or documents subject to official notice.

As to retransmission fees, the Hearing Order cites six documents purportedly raising a question about whether the transaction may have been meant to increase retransmission fees "through the triggering of after-acquired station clauses." App. 947-948 & nn. 68-70, 72-73, 75-77. None is based on competent evidence:

48

| Document Cited in Order | Supporting "Evidence" in Document |
|---|---|
| NewsGuild petition. App. 498-500. | None. |
| Common Cause/UCC petition. App. 408-410. | (1) A magazine article about a prior CMG transaction, and (2) a Standard General proxy statement related to a *prior* effort to propose a minority of board members for TEGNA, which is irrelevant to these transactions. |
| Altice comments. App. 550-552. | (1) A single letter submitted by a cable trade group in opposition to an unrelated application, and (2) a statement in the broadcasters' application that simply describes how the transaction will be implemented (which says nothing about the parties' intent to invoke any particular contractual right). |
| Altice letter. App. 754. | None. |
| ATVA comments. App. 563. | None. |
| DISH Network Corp. comments. App. 861. | (1) An unsworn letter from DISH itself, (2) the NewsGuild petition, and (3) the challengers' motion for additional information. |

Notably, two comments the Media Bureau cited (those of Altice and ATVA) do not even allege that the transactions *will* lead to higher retransmission fees; they merely express concern that higher fees *might* result.  *E.g.*, App. 552 ("*If our concerns are correct * * * .*" (emphasis added)).  And, as explained below, even if the objectors had presented

49

competent evidence, Standard General's binding commitment moots the question.

As to employment, the Hearing Order cites three sources for the conclusion that the transaction might "reduce local jobs" post-closing. App. 952-953 & nn. 103-104, 106-113. All of those documents are likewise deficient:

| Document Cited in Order | Supporting "Evidence" in Document |
|---|---|
| Common Cause/UCC petition. App. 407. | (1) A Standard General proxy statement related to a *prior* effort to propose a minority of board members for TEGNA, and (2) an article headlined "Standard General tells Tegna employees 'no intention to reduce staff.'" |
| NewsGuild letter. App. 725-727. | (1) A deal document, produced by Standard General, which refers to staffing reductions *TEGNA has already independently undertaken*, and (2) a statement in the broadcasters' applications that simply describes how the transaction will be implemented, which says nothing about any intent to reduce jobs. |
| NewsGuild supplement to petition. App. 764-768, 770-772. | An email from a banker *to* Standard General, which NewsGuild introduces to try to discern Standard General's plans by interpreting the banker's use of a single word—"synergies." |

Here again, the Hearing Order does not cite a single statement supported by an affidavit and personal knowledge. And again, as explained below, Standard General's waiver entirely moots the question in any event.

The petitioners failed to meet their burden to make out a "prima facie" case that the applications were not in the public interest based on affidavits or officially noticeable documents, 47 U.S.C. § 309(d)(1), eliminating any valid statutory basis for the Media Bureau to order a hearing. Even assuming that the documents on which the Commission relied could raise a substantial and material fact for a hearing to resolve, there still would have been no basis to order a hearing when the facts to resolve a question are already known. *See Stone*, 466 F.2d at 323. The Commission itself has explained that it does not hold hearings simply to draw inferences from the record. See *Rebel Broadcasting of Mississippi*, 42 F.C.C.2d 499, 501 (1973). It is bound by that policy until it expressly changes it. See *Fox Television Stations*, 556 U.S. at 515-516; *United States ex rel. Accardi* v. *Shaughnessy*, 347 U.S. 260, 265-267 (1954). Here, the Commission flouted its own rules.

2.    In any event, Standard General's binding commitments eliminate any plausible basis for the concerns the agency invoked to justify

setting the matter for a hearing.  Again, Standard General has irrevocably waived its right to enforce any after-acquired clauses that could have increased retransmission fees for the TEGNA stations it proposes to control following the transactions.  App. 831.  And, consistent with its intention of *increasing* rather than reducing station-level staffing, Standard General has made a binding commitment not to conduct any newsroom reductions at TEGNA stations for at least two years after the transactions.  App. 832-833.  No record evidence casts any doubt on either commitment.

If the Commission had concerns about enforcement of the retransmission waivers, it could have approved the transactions while making fulfillment of those self-imposed obligations conditions of approval.  That it did not suggests that the Media Bureau relied on the retransmission and employment issues as a pretext to kill the transactions by delay.

Rather than approve the applications or impose conditions of approval, the Hearing Order credited the challengers' arguments that Standard General's commitments fail to eliminate factual uncertainty around retransmission fees and staffing levels.  But each of the challengers' assertions is unsound.

52

With respect to retransmission fees, the challengers' quibbles were entirely baseless. They contended that the waiver does not expressly bind Standard General's subsidiaries, but Standard General's waiver letter directly contradicts that claim. App. 831, 851. They further speculated that TEGNA and CMG have now learned each other's retransmission rates, and could use that information to manipulate after-acquired clauses in *future* retransmission agreements to raise retransmission fees. App. 896-897. But Standard General (which will own TEGNA upon closing the transaction) certified under penalty of perjury that it had not reviewed the CMG retransmission consent agreements, and the Commission was required to credit that certification over the challengers' unsworn allegations made without personal knowledge. See *Gencom Inc.* v. *FCC*, 832 F.2d 171, 181-182 (D.C. Cir. 1987); App. 746. In any event, retransmission-rate agreements are open to renegotiation periodically, and parties to the agreements can protect their own interests in future agreements. See 47 U.S.C. § 325(b)(3)(C). There is no reason why that should jeopardize applications to transfer licenses now.

The challengers' attacks on Standard General's employment commitment fare no better. They first asserted that the term "journalism or

newsroom staffing" is vague and underinclusive, but reporting-related jobs are the only ones that could even ostensibly implicate the challengers' concerns about the amount and scope of local news coverage. App. 888-889. Next, the challengers argued that the commitment does not include restoring staffing to pre-February 2022 levels. App. 889. They never explain why Standard General would be accountable for employment decisions made *before* it even entered the picture. See *ibid.* The challengers further objected to the commitment's two-year period, but Standard General must maintain its ability to respond to unpredictable changes in economic circumstances that might arise three or more years in the future (and actually plans to *increase* staffing). App. 890. Finally, the challengers complained that the compliance reports that Standard General offered to submit to the Commission to back up their commitment would be unverifiable. *Ibid.* Ironically, the type of reports the challengers proposed—beyond demanding unreasonably sensitive proprietary information—would make labor and employment data public, facilitating the types of anticompetitive effects that purportedly worry them.

*****

In an extraordinary sacrifice to ensure that the applications could be granted and the transaction could close, Standard General made binding commitments to resolve any *possible* concerns about the public interest effects of the transaction. App. 831-833. That should have been the end of the story. Instead, the Media Bureau flyspecked Standard General's irrevocable commitments and declared that some uncertainty remained—without explaining what an ALJ hearing would do to cure the supposed ambiguities. App. 948-949, 951-952. That conclusion was so irrational as to be arbitrary and capricious.

## III. The Proper Remedy Is Reversal, Not Mere Remand

Reversal is required because "only one conclusion would be supportable" on remand. *Donovan ex rel. Anderson* v. *Stafford Construction Co.*, 732 F.2d 954, 961 (D.C. Cir. 1984). The evidence is overwhelming that granting the applications and allowing the transaction to proceed will further "the public interest, convenience, and necessity." 47 U.S.C. § 309(a).

When remanding to the agency for further deliberations "would be futile * * * as only one disposition is possible as a matter of law," this Court "retain[s] and decide[s] the issue" itself, rather than "convert[ing]

55

judicial review of agency action into a ping-pong game." *George Hyman Construction Co.* v. *Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992) (quoting *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); see *Morgan Stanley Capital Group Inc.* v. *Public Utility District No. 1*, 554 U.S. 527, 544-545 (2008). Although the Court often allows an agency that has erred to conduct additional proceedings under the appropriate legal framework, a remand alone "would serve no purpose"—and is therefore unnecessary—when "all the evidence bearing upon the issue is contained in the record" and "no rational factfinder" could reach a different outcome. *Donovan*, 732 F.2d at 961. A remand in such a scenario, without further direction to the agency, would only "delay the inevitable." *Sioux Valley Hospital* v. *Bowen*, 792 F.2d 715, 723-724 (8th Cir. 1986).

That describes the situation here exactly. There is only one rational conclusion that can be drawn from the well-developed record before the agency: granting the applications would serve the public interest. The transaction will increase diversity in broadcasting by creating the largest-ever minority-owned and female-led television station group in the nation; expand opportunities for minority and female journalists and media professionals; further competition by reducing TEGNA's market

share; and substantially increase much-needed investments in local news across the Nation.  App. 605-616.  The Hearing Order never addresses these benefits, despite the fact that increasing diversity in broadcasting has been a critical goal of the Commission for decades—underlying many of its most important rules.  *E.g.*, *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1155 (2021); *Sinclair Broadcasting Group, Inc.* v. *FCC*, 284 F.3d 148, 159-60 (D.C. Cir. 2002).

Despite extensive opportunities for discovery and public comment, all that the Media Bureau and the challengers could muster to oppose the applications was speculation unsupported by any concrete evidence. App. 947-948 (citing App. 408-410, 498-500, 549-552, 563, 754-755, 861), 952-953 (citing App. 407, 725-727, 764-768, 770-772).  And even those baseless concerns were definitively put to rest when Standard General made voluntary and irrevocable commitments to prevent any potential increases in retransmission fees or decreases in newsroom staff.  App. 831-833.  There is thus no reason to hold a hearing, see Part II, *supra*, and there is no further factfinding or deliberation the agency could conduct that would shed additional light on the transactions.

Stated otherwise, the evidence conclusively establishes that there is no substantial question of material fact concerning the applications' effect on the public interest. 47 U.S.C. § 309(d)(2). The statute therefore requires the Commission to "make the grant" of the applications. *Id.* Reversal with instructions to execute those grants is thus the proper remedy.

An open-ended remand for further proceedings would be particularly inappropriate here given the highly time-sensitive nature of the relief the broadcasters are seeking and the Commission's demonstrated propensity for delay. The FCC has egregiously prolonged its resolution of the applications, subjecting the broadcasters to uncommonly protracted discovery in an apparent attempt to kill the deal by condemning it to a hearing that the Commission's Enforcement Bureau concedes cannot be completed in time. App. 1034. Although the broadcasters sought to promptly resolve this matter within the agency before going to court, they were rejected or ignored at every step. App. 969-994, 1039-1090. Given that only 53 days remain to complete the transaction, there is reason to fear that the FCC could run out the clock on remand to consummate its pocket veto of the applications. If that happens, the deal will be

58

permanently dead, causing substantial and irreparable harm to the broadcasters, their employees, and the public.  App. 605-616.

Rather than giving the FCC another "shot at the target," then, the most appropriate course is to bring this matter to the only conclusion supported by the record and the law.  *Checkosky* v. *SEC*, 139 F.3d 221, 227 (D.C. Cir. 1998) (citation omitted) (finding remand "futile" in part because of the "duration of th[e] proceedings"); accord *Middle Rio Grande Conservancy District* v. *Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002) (refusing to remand because of agency's "delayed and inadequate compliance with" the governing law).  At a bare minimum, any remand must direct the Commission to act in accord with its constitutional and statutory obligations and to resolve the matter in time for the broadcasters to pursue any necessary judicial relief before May 22.  But the appropriate resolution is also the most straightforward.  The Court should "simply apply the obvious result" and hold that the FCC must grant the applications.  *American Federation of Government Employees, AFL-CIO* v. *Federal Labor Relations Authority*, 778 F.2d 850, 862 n.19 (D.C. Cir. 1985).

59

## CONCLUSION

This Court should reverse the Hearing Order and remand to the Commission with instructions to take all actions necessary to grant the applications.

March 30, 2023                                    Respectfully submitted,

                                                  */s/ Miguel A. Estrada*

Kevin F. King                                     Miguel A. Estrada
Jennifer A. Johnson                                 *Counsel of Record*
Jocelyn G. Jezierny                               Jonathan C. Bond
COVINGTON & BURLING LLP                           GIBSON, DUNN & CRUTCHER LLP
One CityCenter                                    1050 Connecticut Avenue, N.W.
850 Tenth Street, N.W.                            Washington, D.C.  20036
Washington, D.C.  20001                           (202) 955-8500
(202) 662-6000                                    mestrada@gibsondunn.com

*Counsel for Appellant*                           Stephen J. Hammer
*TEGNA Inc.*                                       GIBSON, DUNN & CRUTCHER LLP
                                                  2001 Ross Avenue, Suite 2100
                                                  Dallas, TX  75201
                                                  (214) 698-3100

David E. Mills
Michael D. Basile
Henry H. Wendel                                   Scott R. Flick
COOLEY LLP                                         Jessica T. Nyman
1299 Pennsylvania Avenue, N.W.                     PILLSBURY WINTHROP
Suite 700                                           SHAW PITTMAN LLP
Washington, D.C.  20004                           1200 Seventeenth Street, N.W.
(202) 842-7800                                    Washington, D.C.  20036
                                                  (202) 663-8000

*Counsel for Appellant*                           *Counsel for Appellant*
*CMG Media Corporation*                           *SGCI Holdings III LLC*

60

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief was prepared using a proportionally spaced type (New Century Schoolbook, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 11,325 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

March 30, 2023                         Respectfully submitted,

                                       _/s/ Miguel A. Estrada_
                                       Miguel A. Estrada
                                       GIBSON, DUNN & CRUTCHER LLP
                                       1050 Connecticut Avenue, N.W.
                                       Washington, D.C.  20036
                                       (202) 955-8500
                                       mestrada@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2023, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

March 30, 2023

Respectfully submitted,

  _/s/ Miguel A. Estrada_
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com