Nos. 23-1083, 23-1084

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION,

Appellants,

v.

FEDERAL COMMUNICATIONS COMMISSION,

Appellee.

———————————

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION,

Petitioners.

———————————

MOTION OF
NATIONAL ASSOCIATION OF BROADCASTERS
FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE*

Richard Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, D.C.  20003
(202) 429-5430
rkaplan@nab.org
jtimmerman@nab.org

March 30, 2023

Stephen B. Kinnaird
    *Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com


*Counsel for Amicus Curiae*
*National Association of Broadcasters*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, movant National Association of Broadcasters ("NAB") discloses that it is a nonprofit, incorporated association of radio and television stations. It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock.

## CERTIFICATE AS TO PARTIES AND INTERVENORS

Pursuant to D.C. Circuit Rule 28(a)(1), NAB certifies that the following are the parties and intervenors before the agency and in this Court.

**Applicants/Appellants/Petitioners**:  SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Appellee/Respondent**: Federal Communications Commission

**Other Parties Before Agency**:  The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.  These parties have moved to intervene in the proceedings in this Court.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
*Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036

(202) 551-1700
stephenkinnaird@paulhastings.com


*Counsel for Amicus Curiae*
*National Association of Broadcasters*

March 30, 2023

## MOTION FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE*

NAB is a non-profit incorporated trade association representing broadcasters across the United States.  NAB advocates for its membership before Congress, the courts, the Federal Communications Commission ("FCC" or "Commission"), and other governmental entities.  NAB frequently appears before this Court both as a party and an *amicus curiae*.  NAB moves for leave to file a brief as *amicus curiae* in both the appeal (No. 23-1083) and the mandamus proceeding (No. 24-1084). The questions raised in these cases are important to NAB's membership, and NAB respectfully submits that its perspective on both the applicable law and the impact of the Commission's actions on the broadcast industry as a whole will aid the Court in resolving the questions presented.[1]

Mergers and acquisitions are critical to the adaptation of the broadcast industry to a rapidly changing competitive and technological environment.  Such

---

[1] NAB sought consent from the parties to its filing of an *amicus curiae* brief in both the appeal and the mandamus proceeding.  Appellants/petitioners SGCI Holdings III LLC, TEGNA Inc., and CMG Media Corporation consented, but the Commission stated that it takes no position on NAB's request to file an *amicus* brief in support of the appellants/petitioners.  Proposed intervenors the NewsGuild-Communications Workers of America, National Association of Broadcast Employees and Technicians-Communications Workers of America, Common Cause, and the Office of Communication of the United Church of Christ, Inc. likewise state that they take no position on NAB's request.  Accordingly, pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b), NAB files this motion for leave to file an *amicus curiae* brief.

1

mergers and acquisitions typically require the transfer of station licenses, and the
Commission must determine whether the license transfer serves the public interest.
47 U.S.C. §§ 309(a), 310(d).  Interested parties are permitted to contest license
applications.  *Id.* § 309(d).  But Congress recognized that time is of the essence for
license transfers; new owners need to retain station employees, move immediately
to implement business and programming strategies, and meet financing
obligations.  License applications cannot be bogged down in unnecessary
evidentiary hearings, which, while sometimes indispensable, "may also be
exploited for unworthy purposes."  *United States v. FCC*, 652 F.2d 72, 91 (D.C.
Cir. 1980) (en banc).  Accordingly, Congress amended section 309 to "put a heavy
burden on a party submitting a petition to deny," *California Broadcasting Forum
v. FCC*, 752 F.2d 670, 674 (D.C. Cir. 1985); *Stone v. FCC*, 466 F.2d 316, 322
(D.C. Cir. 1972), imposing strict evidentiary showings that petitioners must make
to create a "substantial and material question of fact" warranting an evidentiary
hearing, 47 U.S.C. §§ 309(d) & (e).

NAB does not typically become involved in the license transfer applications
of its members.  But here, the Media Bureau accepted the license transfer
applications for filing in April 2022.  The Media Bureau dallied for ten months
before ultimately designating matters for hearing, on grounds that cannot form the
basis of a public-interest rejection of a license application.  The Media Bureau

ordered the hearing despite the applicants' commitments to obviate the putative
public-interest harms.  The Media Bureau well knew (based on the expiration of
financing commitments) that the hearing designation would kill the deal before a
decision could be rendered on the merits.  Its action injects untenable
unpredictability into license transfer applications, and will make it difficult for
broadcasters to raise the capital necessary to compete in a fast-evolving market.

The Media Bureau's significant departure from Commission precedent—all
without a vote of the full Commission—means in practice that no party
contemplating an investment in broadcast TV or radio stations can, with any level
of certainty, predict how the FCC will process its license transfer.  And especially
given how the Commission dragged out this review for over a year, potential
investors may very well think twice before tying up capital in an uncertain and
indeterminate proceeding.

NAB's proposed *amicus curiae* brief (attached hereto as an addendum)
presents its unique perspective on the Commission's public-interest review powers,
the Commission's authority to deny license applications based on the exercise of
rights in retransmission consent agreements or employee staffing levels, and the
impact upon the broadcast industry if the Media Bureau's action is allowed to
stand.  NAB respectfully submits that this brief will aid the Court in resolving the
issues at hand.

## CONCLUSION

This Court should grant NAB leave to file the attached brief as *amicus curiae*.

/s/ Stephen B. Kinnaird

Richard Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, D.C.  20003
(202) 429-5430
rkaplan@nab.org
jtimmerman@nab.org

March 30, 2023

Stephen B. Kinnaird
   *Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

*Counsel for Amicus Curiae*
*National Association of Broadcasters*

4

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this motion complies with the applicable typeface, type style, and type-volume limitations.  This motion was prepared using a proportionally spaced type (Times New Roman, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this motion contains 733 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this motion.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
*Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

*Counsel for Amicus Curiae*
*National Association of Broadcasters*

March 30, 2023

# CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2023, I electronically filed the foregoing motion with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing motion to be served by Next Day service and by electronic mail on the Commission and on parties to the proceedings before the Commission (appellants/petitioners and proposed intervenors) as follows:

| **Federal Communications Commission**<br><br>Attn: General Counsel<br>45 L Street, NW<br>Washington, DC 20554<br>LitigationNotice@fcc.gov | **SGCI Holdings III, LLC**<br><br>c/o Miguel A. Estrada<br>Jonathan C. Bond<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C.  20036<br>(202) 955-8500<br>mestrada@gibsondunn.com<br>jbond@gibsondunn.com<br><br>Stephen J. Hammer<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, TX  75201<br>(214) 698-3100<br>shammer@gibsondunn.com |

| | c/o Scott R. Flick<br>Jessica T. Nyman<br>PILLSBURY WINTHROP SHAW PITTMAN LL<br>1200 Seventeenth Street, N.W.<br>Washington, D.C.  20036<br>(202) 663-8000<br>scott.flick@pillsburylaw.com<br>Jessica.nyman@pillsburylaw.com |
|---|---|
| **United Church of Christ Media Justice Ministry**<br><br>c/o Cheryl A. Leanza<br>100 Maryland Avenue, NE<br>Washington, DC 20002<br>cleanza@alhmail.com | **CMG Media Corporation**<br><br>c/o Michael D. Basile<br>Henry H. Wendel<br>COOLEY LLP<br>1299 Pennsylvania Avenue,<br>N.W. Suite 700<br>Washington, D.C.  20004<br>(202) 842-7800<br>mdbasile@cooley.com<br>hwendel@cooley.com |
| **Common Cause**<br><br>c/o Yosef Gettachew<br>805 15th Street NW, Suite 800<br>Washington, DC 20005<br>ygetachew@commoncause.org | **TEGNA, Inc.**<br><br>c/o Jennifer A. Johnson<br>Jocelyn Jezierny<br>COVINGTON & BURLING LLP<br>One CityCenter<br>850 Tenth Street, N.W.<br>Washington, D.C.  20001<br>(202) 662-6000<br>jjohnson@cov.com<br>Jjezierny@cov.com |
| **NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA**<br><br>c/o Andrew J. Schwartzman<br>1341 G Street, NW Fifth Floor<br>Washington, DC 20005 | |

AndySchwartzman@gmail.com

c/o David Goodfriend
The Goodfriend Group
208 I Street, NE
Washington, DC 20002
David@dcgoodfriend.com

c/o Arthur Belendiuk
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W.
Suite 301
Washington, D.C. 20016
abelendiuk@fccworld.com

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
  *Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

*Counsel for Amicus Curiae*
*National Association of Broadcasters*

March 30, 2023

# ADDENDUM

Nos. 23-1083, 23-1084

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION,

*Appellants*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee*.

---

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION,

*Petitioners*.

---

## BRIEF OF *AMICUS CURIAE*
## NATIONAL ASSOCIATION OF BROADCASTERS
## IN SUPPORT OF PETITIONERS AND REVERSAL OR MANDAMUS

Richard Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, D.C. 20003
(202) 429-5430
rkaplan@nab.org
jtimmerman@nab.org

March 30, 2023

Stephen B. Kinnaird
  *Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com


*Counsel for Amicus Curiae*
*National Association of Broadcasters*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *Amicus Curiae* National Association of Broadcasters ("NAB") discloses that it is a nonprofit, incorporated association of radio and television stations.  It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), NAB certifies the following:

### A.    PARTIES

The following are the parties before the agency and in this Court:

**Applicants/Appellants/Petitioners**:  SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Appellee/Respondent**: Federal Communications Commission

**Other Parties Before the Agency**:  The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.  These parties have moved to intervene in the proceedings in this Court.

**B.     RULINGS BELOW**

References to the rulings at issue appear in the Notice of Appeal (20-1083)

and the Petition for Mandamus (20-1084).

**C.     RELATED CASES**

There are no related cases other than the appeal and mandamus referenced

above.


                    /s/ Stephen B. Kinnaird

                    Stephen B. Kinnaird
                      *Counsel of Record*
                    PAUL HASTINGS LLP
                    2050 M Street, N.W.
                    Washington, D.C.  20036
                    (202) 551-1700
                    stephenkinnaird@paulhastings.com


                    *Counsel for Amicus Curiae*
                    *National Association of Broadcasters*

                    March 30, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

GLOSSARY ........................................................................................v

STATEMENT OF INTEREST OF AMICUS CURIAE ........................................1

ARGUMENT ......................................................................................2

I.  The Commission Has Blocked a Legitimate Station Transfer
    Transaction by *Ultra Vires* Action. ..............................................2

    A.  The Commission Can Order Evidentiary Hearings Only Upon
        Finding Evidence of Substantial Factual Questions That Are
        Material to Its Public Interest Inquiry. ..................................3

    B.  Public Interest Review Is Not a Mechanism for Regulating
        Licensee Business Contracts and Employment Practices. ..................5

        1.  The Commission Has No Power under Section 309 to
            Regulate Rates in Retransmission Agreements. .......................6

        2.  The Commission Has No Power under Section 309 To
            Regulate Staffing Levels. ...........................................9

        3.  The Applicants' Commitments Should Have Obviated
            the Need for a Hearing. ............................................13

II. The Media Bureau's Actions Create Untenable Unpredictability in
    Mergers and Acquisitions and Must Be Reviewed Now. ......................14

CONCLUSION ...................................................................................18

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*2014 Quadrennial Regulatory Review*,
  Order on Reconsideration and Notice of Proposed Rulemaking, 32
  FCC Rcd 9802 (2017) ..........................................................................17

*Assignment of Broadcast Television Licenses from Meredith Corp. to
  Gray Television Licensee, LLC*,
  36 FCC Rcd 15870 (2021) ............................................................10, 13

*Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC*,
  595 F.2d 621 (D.C. Cir. 1978) .....................................................11

*California Broadcasting Forum v. FCC*,*
  752 F.2d 670 (D.C. Cir. 1985) ...................................................5, 11

*FCC v. Sanders Bros. Radio Station*,*
  309 U.S. 470 (1940) ....................................................................6, 11

*In the Matter of Applications For Consent To Transfer Control of
  Certain License Subsidiaries of Raycom Media, Inc. to Gray
  Television, Inc.*,
  MB Docket No. 18-230, 2018 WL 6722650 (FCC Dec. 20, 2018) ...................13

*In the Matter of Consent to Transfer Control of Certain Subsidiaries
  of TEGNA Inc. to SGCI Holdings III LLC*,
  MB Docket No. 22-162, Hearing Designation Order (Feb. 24,
  2023) ..........................................................................................3

*In The Matter Of Consent To Transfer Control of Certain License
  Subsidiaries of NBI Holdings, LLC To Terrier Media Buyer, Inc.*,
  34 FCC Rcd 10554 (2019) ............................................................10, 12

---

[1] Authorities on which we principally rely are marked with an asterisk.

ii

*In the Matter of: Implementation of the Satellite Home Viewer
    Improvement Act of 1999,*
    15 FCC Rcd 5445 (2000) ........................................................................7

*In the Matter of the Applications of Tribune Media Company
    (Transferor) and Nexstar Media Group, Inc. (Transferee),*
    Memorandum Opinion and Order, 34 FCC Rcd 8436 (2019)*
    ......................................................................................9, 10, 12, 13

*Mobilfone of Northeastern Pennsylvania, Inc. v. FCC,*
    682 F.2d 269 (D.C. Cir. 1982) .................................................................5

*National Broadcasting Co. v. United States,**
    319 U.S. 190 (1943) .........................................................................6, 10

*Regents of Univ. Sys. of Ga. v. Carroll,*
    338 U.S. 586 (1950) ...............................................................................6

*United States v. FCC,**
    652 F.2d 72 (D.C. Cir. 1980) .................................................................15

*Univision Holdings, Inc.,*
    Memorandum Opinion and Order, 7 FCC Rcd 6672 (1992) ...............12

**Statutes**

47 U.S.C.
    § 303(r) ................................................................................................14
    § 307(a) .........................................................................................4, 7, 10
    § 308(b) ..................................................................................................4
    § 309 .............................................................................................*passim*
    § 309(a) .........................................................................................4, 7, 10
    § 309(d)(1) .......................................................................................4, 11
    § 309(d)(2) .............................................................................................5
    § 309(e) ...............................................................................................5, 9
    § 310(d) ..................................................................................................4
    § 325 .......................................................................................................7
    § 325(b)(1) .............................................................................................7
    § 325(b)(3)(C) ........................................................................................7

**Other Authorities**

*2022 Communications Marketplace Report*, GN Docket No. 22-203,
    FCC 22-103 (Dec. 30, 2022) ..............................................................16

BIA Advisory Services, *Economic Impact of Big Tech Platforms on
    the Viability of Local Broadcast News* (May 2021), Attachment B
    to Comments of NAB, MB Docket No. 18-349 (Sept. 2, 2021) ......................17

*Commission Policies and Procedures Under Section 310(b)(4) of the
    Communications Act, Foreign Investment in Broadcast Licensees*,
    Declaratory Ruling, 28 FCC Rcd 16244 (2013)..................................18

J. Legum and T. Zekeria, *How Facebook's Algorithm Devalues Local
    Reporting,* Popular Information (June 22, 2021)................................17

Joel Brown, *Jacqueline Policastro of Gray Television Delivers the
    Beltway to Heartland Viewers*, Bostonia (Summer 2018)
    https://www.bu.edu/bostonia/summer18/gray-television-
    washington-news-bureau-chief-jacqueline-policastro/ (last visited
    March 29, 2023)..................................................................13

K. Makuch and J. Levy, *Market Size and Local Television News*, OEA
    Working Paper 52 (Jan. 15, 2021) .....................................................17

*Overview of the FCC's Review of Significant Transactions*,
    https://www.fcc.gov/reports-research/guides/review-of-significant-
    transactions .........................................................................15

S. Fischer, K. Jaidka and Y. Lelkes, *Auditing Local News Presence on
    Google News*, 4 Nature Human Behavior 1236 (Dec. 2020) ..........................17

# GLOSSARY

| Federal Communications Commission | FCC or Commission |
|---|---|
| Multichannel Video Programming Distributor | MVPD |
| National Association of Broadcasters | NAB |

## STATEMENT OF INTEREST OF AMICUS CURIAE[2]

NAB is a non-profit trade association representing broadcasters across the United States.  NAB advocates for its membership before Congress, the courts, the Federal Communications Commission ("FCC" or "Commission"), and other governmental entities.

NAB rarely, if ever, participates in proceedings to review its members' license transfer applications.  But the Media Bureau's actions in this matter—designating matters for hearing that cannot form the basis of a public-interest rejection of a license application, knowing that the hearing designation will kill the deal before a decision on the merits—inject untenable unpredictability into license transfer applications.  It will make it difficult for broadcasters to raise the capital necessary to compete in a rapidly changing technological environment.  The Media Bureau's significant departure from Commission precedent—all without a vote of the full Commission—means in practice that no party contemplating an investment in broadcast stations can, with any certainty, predict how the FCC will process its license transfer.  Especially given how the Commission dragged out this review for over a year, potential investors may think twice before tying up capital in uncertain, untethered, and indeterminate FCC proceedings.  At a time when local

---

[2] NAB certifies that no party, party's counsel, or person other than NAB, its members, or counsel authored this brief in whole or in part, or contributed money intended to fund its preparation or submission.

journalism has never been more important, NAB presents the broadcast industry's unique perspective to aid the Court in resolution of the matter at hand.

## ARGUMENT

### I.   The Commission Has Blocked a Legitimate Station Transfer Transaction by *Ultra Vires* Action.

Cognizant of the perils of undue delay in processing license applications, Congress adopted stiff evidentiary requirements that must be satisfied before the Commission may order a hearing on whether granting a license would serve the public interest.  In the order on review,[3] which the Commission declined to countermand, the Media Bureau disregarded these statutory limits, relying on gossamer evidence to order a hearing on matters that under Commission and judicial precedent are not even germane to its review authority, even after the applicants made binding commitments to obviate the alleged public-interest harms. This Court should not allow the agency to abuse its procedural powers, effectively denying a license application and killing a deal while evading a substantive public-interest determination.

---

[3] *In the Matter of Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, MB Docket No. 22-162, Hearing Designation Order ¶ 16 (Feb. 24, 2023) ("Hearing Order").

2

**A.    The Commission Can Order Evidentiary Hearings Only Upon Finding Evidence of Substantial Factual Questions That Are Material to Its Public Interest Inquiry.**

Congress has directed the Commission to grant applications for station licenses "if public convenience, interest, or necessity will be served thereby." 47 U.S.C. § 307(a). Commission regulations may prescribe matters to be addressed in applications such as "the citizenship, character, and financial, technical, and other qualifications of the applicant"; station ownership and location; frequencies, powers, and operating periods; "the purposes for which the station is to be used; and such other information as it may require." *Id.* § 308(b). The Commission may also require "further written statements of fact" from the applicant. *Id.*

After receiving an application for a station license (or a license transfer), "the Commission shall determine … whether the public interest, convenience, and necessity will be served by the granting of such application." *Id.* §§ 309(a), 310(d). Interested parties may file a petition to deny the application. *Id.* § 309(d)(1). Such petitions "shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with" the public-interest standard, and such allegations (unless subject to official notice) "shall … be supported by affidavit of a person or persons with personal knowledge thereof." *Id.* The applicant may "file

3

a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit." *Id.*

In resolving a challenge, the Commission takes one of two actions.  If "there are no substantial and material questions of fact and a grant of the application would be consistent with" the public interest, "it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition." *Id.* § 309(d)(2).  By contrast, "[i]f … a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing" on identified grounds. *Id.* § 309(e).

As this Court has commented, "This statutory standard puts a heavy burden on a party submitting a petition to deny.  For a hearing on the application to be required, the party must, with statutorily required specificity and support, raise controverted factual issues that are substantial and material," *California Broadcasting Forum v. FCC.* 752 F.2d 670, 674 (D.C. Cir. 1985), *i.e.*, "material to a finding of what is in the public interest." *Mobilfone of Northeastern Pennsylvania, Inc. v. FCC*, 682 F.2d 269, 271 (D.C. Cir. 1982).

Here, the Media Bureau set two issues for hearing: namely, (1) whether the transaction will impermissibly increase the rates multichannel video programming

distributors (MVPDs)—*i.e.*, cable and satellite operators—pay for the retransmission of broadcast programming, and (2) whether the transaction will result in reductions in station-level staffing. Hearing Order ¶ 16. Because neither issue is even colorably material to a proper public-interest inquiry, the Media Bureau's action is unlawful.

### B. Public Interest Review Is Not a Mechanism for Regulating Licensee Business Contracts and Employment Practices.

The Media Bureau's expansive conception of its public-interest review authority cannot be sustained. The public-interest provision does not "confer an unlimited power. The requirement is to be interpreted by its context, by the nature of radio transmission and reception, [and] by the scope, character, and quality of services." *National Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943) (internal quotation marks and ellipsis omitted) ("*NBC*"). While the Commission may inquire into "the ability of the licensee to render the best practicable service to the community reached by his broadcasts," "the Act does not essay to regulate the business of the licensee. The Commission is given no supervisory control of the programs, of business management or of policy." *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940). Nor does the Communications Act "give authority to the Commission to determine the validity of contracts between licensees and others." *Regents of Univ. Sys. of Ga. v. Carroll*, 338 U.S. 586, 602

(1950).  Here, the Media Bureau exceeded the public-interest authority granted in

Sections 307(a) and 309(a) of the Act.

### 1.    The Commission Has No Power under Section 309 to Regulate Rates in Retransmission Agreements

The Media Bureau overstepped its bounds when it ordered a public-interest

inquiry into whether the purchaser may structure a transaction to capitalize on

favorable terms in its retransmission contracts that may have allowed it to charge

higher rates to MVPDs.  The Commission has no business regulating broadcaster

contracts generally, but *a fortiori* it has no power here.  Congress has denied the

Commission the power to regulate rates in retransmission consent agreements,

limiting its role to ensuring good-faith negotiations.  The Commission cannot

shoehorn into the public-interest standard jurisdiction over matters that Congress

has otherwise denied it.

In section 325 of the Communications Act, Congress prohibited MVPDs

from retransmitting broadcast signals without broadcaster consent.  47 U.S.C.

§ 325(b)(1).  The statute circumscribes the Commission's regulatory authority.

Beyond regulations addressing the basic service tier, the Commission is authorized

only to promulgate regulations ensuring that the parties negotiate in good faith.  *Id.*

§ 325(b)(3)(C).  As the Commission has acknowledged, Congress "does not intend

to subject retransmission consent negotiation to detailed substantive oversight by

the Commission."  *In the Matter of: Implementation of the Satellite Home Viewer*

*Improvement Act of 1999,* 15 FCC Rcd 5445 ¶ 6 (2000).  Congress instead relied

upon market-based exchanges of rights between broadcasters and MVPDs.  *Id.*

¶ 14.  The Commission thus has no role in determining what rates are proper; "it is

the retransmission consent negotiations that take place that are the market through

which the relative benefits and costs to the broadcaster and MVPD are

established."  *Id.* ¶¶ 8, 53.  "Congress clearly did not intend the Commission to sit

in judgement of the terms of every retransmission consent agreement executed

between a broadcaster and an MVPD."  *Id.* ¶ 23.

Given that Congress has denied the Commission power to regulate

retransmission rates, the Media Bureau could not use a broadcaster's enforcement

of contracted retransmission rates as grounds to deny a license application.  The

broadcaster and the MVPDs here agreed that after-acquired stations would be

subject to the contract rate.  MVPDs are sophisticated parties that do not need

special protection, and would have understood that sometimes a higher

retransmission rate might incentivize a broadcaster to structure a deal in a certain

way.  Presumably, the MVPD either found the after-acquired-stations term

advantageous (because contracts would not be reopened with the acquisition of

new stations) or negotiated other favorable terms in exchange for it; this one

provision cannot be viewed in isolation.  Indeed, the Commission has previously

found nothing nefarious in after-acquired clauses:

> Such after-acquired station clauses were negotiated by the parties
> outside of this transaction, and there is no apparent reason to step in
> and deny one party the benefit of the negotiated bargain absent
> evidence of anticompetitive practices or other wrongdoing not
> apparent here. In addition, the Commission is not the proper forum for
> resolving an alleged private contractual dispute.

*In the Matter of the Applications of Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee)*, Memorandum Opinion and Order, <u>34 FCC Rcd 8436, 8462-63</u> ¶ 59 (2019) ("*Nexstar*").

Nonetheless, the Media Bureau posited that a public-interest harm might ensue *if* in this circumstance there was "evidence of anticompetitive practices or wrongdoing" rather than "a properly functioning competitive marketplace." Hearing Order ¶¶ 23-24.  But it identified no evidence of anticompetitive wrongdoing here remotely justifying a hearing under Section 309(e); the broadcaster simply would have exercised freely negotiated commercial contract rights.  The Media Bureau's declaration that there is a substantial and material question whether "the sequencing of the Transactions constitutes anticompetitive activity," Hearing Order ¶ 32, is unadorned by any legal theory of competition, economic analysis, or discussion of the relevant markets.  It is a contrivance to suffocate the deal, not proper legal justification to hold an evidentiary hearing.

Finally, the Media Bureau cited no evidence creating a substantial and material question "whether consummation of the Transactions will likely cause an increase in rates for the retail subscribers of the MVPDs."  Hearing Order ¶ 32.

The Commission has previously declined to find that increases in retransmission rates alone harm the public interest, *Nexstar*, 34 FCC Rcd ¶ 29, especially where the record "does not show whether, on balance, they would reduce consumer welfare or rather just shift surplus between MVPDs and broadcast stations." *In The Matter Of Consent To Transfer Control if Certain License Subsidiaries of NBI Holdings, LLC To Terrier Media Buyer, Inc.*, 34 FCC Rcd 10554, ¶ 31 (2019) ("*NBI*"). But even had there been such evidence, the prices *MVPDs* charge their customers is irrelevant to whether a *broadcast* licensee serves the public interest under Sections 307(a) and 309(a). "The 'public interest' to be served under the Communications Act is … the interest of the listening public in 'the larger and more effective use of radio.'" *NBC*, 319 U.S. at 216. The Hearing Order wanders far afield from a proper licensing inquiry.

### 2. The Commission Has No Power under Section 309 To Regulate Staffing Levels.

The Media Bureau's second ground fares no better. Purportedly to promote localism, the Commission for the first time suggests that a hypothetical reduction in station-level staffing is proper grounds for denying a license application. Hearing Order ¶¶ 43, 51(b). The Media Bureau also asked whether ownership of the stations by a private equity fund, *id.* ¶¶ 45-46, or SGCI's purported plans to use Washington, DC and regional news bureaus (the latter of which was not even

alleged in the record) disserve the public interest based on any impact on staffing, *id.* ¶¶ 47-50.

These stated grounds for designation reflect a misconception of the Section 309 inquiry.  Because the FCC has no power to regulate licensee business practices, *Sanders Bros.*, 309 U.S. at 475, it is incumbent upon the petitioners seeking to deny the license application to demonstrate *with sworn evidence based on personal knowledge* a substantial question material to the public-interest determination: namely, evidentiary facts (not mere conjecture) that if true demonstrate harm to local broadcasting.  *See* 47 U.S.C. § 309(d)(1); *California Broadcasting Forum,* 752 F.2d at 674.  No such evidence was provided.

Accordingly, the Commission may not grant a hearing merely because it suspects the future inadequacy of newsroom staffing levels.  An applicant's employment practices are only relevant to a license transfer review if they concern suspected employment discrimination or influence the station's ability to reflect the minority viewpoints of its community of license.  *See Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC*, 595 F.2d 621, 628 (D.C. Cir. 1978) (en banc) ("In view of the purposes of its regulatory legislation, the FCC analyzes the employment practices of its licensees *only* to the extent those practices affect the obligation of the licensee to provide programming that fairly reflects the tastes and the viewpoints of minority groups, and to the extent those practices raise questions

about the character qualifications of the licensee.")  (internal quotation marks

omitted and emphasis added).   The Commission has "never suggested that a

reduction in a station's staff is contrary to the public interest if conducted in a

nondiscriminatory manner."  *Univision Holdings, Inc.*, Memorandum Opinion and

Order, 7 FCC Rcd 6672, 6683 n.45 (1992).  Nor have Congress, the Commission

or the courts ever indicated that a particular number of station employees is

optimal to serve the public interest.  The Media Bureau does not even attempt to

quantify at what staffing levels its version of "localism" can be achieved.  The

Media Bureau's approach would not only interfere with the broadcaster's First

Amendment discretion, but would impede the ability of broadcasters to remain

economically competitive.

The other staffing-related inquiries that the Media Bureau set for hearing are

similarly frivolous.  There is no logical nexus between a purchaser's ownership

structure and a commitment to local content through staffing levels, and "the

Commission has previously approved transactions involving private equity firms."

*NBI*, 34 FCC Rcd ¶ 35.  The Commission is not permitted to pick its preferred

licensee, and Congress has never imbued the FCC with the power to determine—

short of specific findings regarding an applicant's character qualifications—that

one class of funding is permissible while another somehow violates the public

interest.

With regard to purported remote bureaus, the Commission in the past has found that using a Washington, D.C. bureau benefits (rather than impairs) the public interest. *See Nexstar*, 34 FCC Rcd ¶ 32; *NBI*, 34 FCC Rcd ¶ 35. Indeed, innovative stations use D.C. bureaus to enhance localism by reporting on elected officials or national policy and legislative initiatives that are significant for their communities. *See* Joel Brown, *Jacqueline Policastro of Gray Television Delivers the Beltway to Heartland Viewers*, Bostonia (Summer 2018), https://www.bu.edu/bostonia/summer18/gray-television-washington-news-bureau-chief-jacqueline-policastro/ (last visited March 29, 2023).

Likewise, while the record lacks even an allegation that Standard General plans to use regional bureaus, the Commission has rejected the claim that regional bureaus disserve the public interest. *Nexstar*, 34 FCC Rcd ¶ 32.[4] Here, too, there is no substantial question of fact material to the public interest for the Commission to resolve. The Media Bureau's fishing expedition based on speculation as to a broadcaster's "plans to gather and broadcast local news remotely," Hearing Order ¶ 50, cannot justify a Section 309 evidentiary hearing.

---

[4] *In the Matter of Applications For Consent To Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. to Gray Television, Inc.*, MB <u>Docket No. 18-230, 2018 WL 6722650</u>, ¶ 14 (FCC Dec. 20, 2018); *Assignment of Broadcast Television Licenses from Meredith Corp. to Gray Television Licensee, LLC*, <u>36 FCC Rcd 15870</u> (2021).

### 3.    The Applicants' Commitments Should Have Obviated the Need for a Hearing.

Even though the Media Bureau's grounds for setting a hearing were improper, the Applicants obviated any need for a hearing by committing to avoid the (non-existent) public-interest harm that its adversaries had manufactured.  The Applicants irrevocably committed not to enforce the after-acquired clauses of the retransmission consent agreements and to allow the MVPD to select the existing contract.  *See* Hearing Order ¶¶ 28-29, 31.  These irrevocable commitments removed any possible public-interest harm.  The Media Bureau's illogical equivocation that "especially given questions about the intended scope of the commitments relating to enforcement of such clauses, we are unable to find that the commitments offered by the Applicants would adequately mitigate such a result," Hearing Order ¶ 32, raises doubt as to the Media Bureau's motivations. The Media Bureau's failure to adhere to standard practice and meet with the applicants to inquire further about the scope of these commitments or request adjustments reveals the pretextual nature of its concerns.

The Applicants also fully eliminated any doubt as to the purported localism concerns by committing not to reduce local newsroom staff for at least two years. *See* Hearing Order ¶ 44.  Given that the Commission could impose those commitments as license conditions, 47 U.S.C. § 303(r), and clarify in the license conditions any purported ambiguity as to the licensee's duties, *see* Hearing Order

13

¶ 44, these commitments should have erased the retransmission- and staffing-related objections entirely.  The Media Bureau's intransigence reveals its determination to kill this deal by delay without any proper decision on the merits.

## II.    The Media Bureau's Actions Create Untenable Unpredictability in Mergers and Acquisitions and Must Be Reviewed Now.

This Court has recognized the potential for abuse of Section 309 evidentiary hearings:

> To allow others to force the Commission to conduct further evidentiary inquiry would be to arm interested parties with a potent instrument for delay.  The sad truth about agency decisionmaking and evidentiary inquiries is that they take time; and time often works to the advantage of one party over another.  Although evidentiary hearings and other procedural devices are useful and sometimes indispensable they may also be exploited for unworthy purposes.

*United States v. FCC*, 652 F.2d 72, 91 (D.C. Cir. 1980) (en banc).

This is the paradigmatic case of the exploitation of evidentiary hearings for unworthy purposes.  Recognizing the need for expedition, the Commission has set a six-month "shot clock" for ruling on license transfer applications.  *See Overview of the FCC's Review of Significant Transactions*, https://www.fcc.gov/reports-research/guides/review-of-significant-transactions.  Here, despite being aware that the deal financing would expire on May 22, 2023, the Media Bureau blew through this deadline, protracting the proceedings by granting a series of extensions and discovery requests despite the untenable and oft-rejected public-interest contentions raised by the challengers.  And then late in the game, the Media

Bureau ordered an evidentiary hearing on meritless issues that could never be resolved before the financing would expire and the deal would collapse.

This decision is extraordinarily damaging precedent for the broadcast industry. Investors will likely refuse to engage in broadcast transactions if the Commission can terminate them arbitrarily with the cudgel of an improper, late-hour evidentiary hearing, foreclosing both a reasoned merits decision and the possibility of timely judicial review. Investors will not run the risks of wasted resources or breakage fees that may run into the tens or hundreds of millions of dollars if law and precedent do not count, and if the Commission can use procedural maneuvers to terminate deals with impunity for undisclosed motivations or from hostility to private equity investors. Financing of such deals may dry up or become more expensive. Existing station owners may not be able to command full value for their assets if benign transactions like this one suddenly become more risky.

The broadcast industry cannot tolerate this kind of unpredictability given the relentless competitive and technological pressures that it faces. Competition from largely unregulated online subscription and advertising-supported video streaming services has harmed broadcast TV viewership. *2022 Communications Marketplace Report*, GN Docket No. 22-203, FCC 22-103, ¶¶ 254, 280, 284 (Dec. 30, 2022). In 2021, local broadcast TV station advertising revenue dropped

to $9.7 billion while local online advertising grew to $65 billion. *Id.* ¶ 289. The giant technology platforms dominate both content discovery and digital advertising; they impede local stations' ability to connect with their audiences online, and impose advertising limits and policies that prevent local stations from effectively monetizing their own content online. Economic losses to broadcasters from these practices approach $2 billion annually.[5]

Moreover, economic forces threaten the viability of many stations. A study by the Commission's Office of Economics and Analytics has concluded that most TV markets cannot sustain four independent news operations, and that mergers eliminating a source of local news programming may be "optimal," if the "merged entity improves the quality or increases the quantity of local news programming."[6] The Commission has recognized the importance of economies of scale to broadcasting, including local news production.[7] Mergers and acquisitions enable

---

[5] BIA Advisory Services, *Economic Impact of Big Tech Platforms on the Viability of Local Broadcast News* (May 2021), Attachment B to Comments of NAB, MB Docket No. 18-349 (Sept. 2, 2021); *see also* S. Fischer, K. Jaidka and Y. Lelkes, *Auditing Local News Presence on Google News*, 4 Nature Human Behavior 1236, 1243 (Dec. 2020); J. Legum and T. Zekeria, *How Facebook's Algorithm Devalues Local Reporting,* Popular Information (June 22, 2021).

[6] K. Makuch and J. Levy, *Market Size and Local Television News*, OEA Working Paper 52, at 4, 21 (Jan. 15, 2021).

[7] *2014 Quadrennial Regulatory Review*, Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802, ¶¶ 72, 81 (2017).

stations to achieve the economies of scale and scope that are necessary for broadcasters to thrive and serve their local audiences.

The Commission also has long recognized that "limited access to capital is a concern in the broadcast industry." *Commission Policies and Procedures Under Section 310(b)(4) of the Communications Act, Foreign Investment in Broadcast Licensees*, Declaratory Ruling, 28 FCC Rcd 16244 ¶ 10 (2013).  Infusions of capital are particularly important now as the TV industry migrates to the next-generation television standard, ATSC 3.0, which integrates seamlessly with internet protocol, improves spectrum efficiency, and allows enhanced viewer services.  Broadcasters achieving greater efficiencies through station combinations could better fund this vital transition.

Mergers and acquisitions are essential to the long-term health of the broadcast industry and the efficient deployment of capital.  The Commission has a statutory duty to review whether license transfer applications serve the public interest, but it must conduct that review fairly and in accordance with law and precedent.  The Media Bureau's action cannot stand.  While hearing designation orders are not theoretically final, they always kill transactions in fact.  This Court should treat this order according to its intent and effect—a *de facto* final denial of the license application—and hear the appeal.  Alternatively, because the Hearing

17

Order was legally unjustified, the petitioners here have a clear and indisputable right to mandamus relief.

## CONCLUSION

This Court should grant the relief requested by Appellants/Petitioners.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
  *Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com


*Counsel for Amicus Curiae*
*National Association of Broadcasters*

March 30, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this amicus curiae brief complies with the applicable typeface, type style, and type-volume limitations. This petition was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 3,887 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
  *Counsel of Record*
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

*Counsel for Amicus Curiae*
*National Association of Broadcasters*

March 30, 2023